**2021 IL 126931**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 126931)

*In re* Z.L. *et al.*, Minors, Appellants (The People of the State of Illinois, Appellant, v. K.G., Appellee).

*Opinion filed December 2, 2021.*

CHIEF JUSTICE ANNE M. BURKE delivered the judgment of the court, with opinion.

Justices Garman, Theis, Neville, Michael J. Burke, Overstreet, and Carter concurred in the judgment and opinion.

## OPINION

¶ 1    The circuit court of Cook County adjudicated Z.L. and Z.L.'s siblings abused and neglected minors under section 2-3 of the Juvenile Court Act (Act) (705 ILCS 405/2-3 (West 2018)) and made the minors wards of the court. The appellate court reversed the findings of abuse and neglect and remanded the cause to the circuit

court for compliance with the Indian Child Welfare Act of 1978 (Indian Child Welfare Act) (25 U.S.C. § 1912(a) (2012)). 2020 IL App (1st) 200151. For the reasons that follow, we reverse the judgment of the appellate court and affirm the judgment of the circuit court. We also remand this cause to the circuit court for further proceedings consistent with this opinion.

¶ 2                                    BACKGROUND

¶ 3        K.G. and E.L. Sr. had five children: E.L. Jr., born October 1, 2005; T.L., born December 23, 2006; S.L., born August 31, 2010; N.L., born March 16, 2014; and Z.L., born May 10, 2018. Z.L. was born premature at 26 weeks.

¶ 4        T.L. died on February 1, 2007, at the age of five weeks. Thereafter, the State filed a petition for neglect of E.L. Jr., alleging, *inter alia*, he was neglected due to an injurious environment because his infant brother had died of several nonaccidental injuries. In 2008, the circuit court of Du Page County found E.L. Jr. neglected as alleged in the petition. In June 2009, the appellate court affirmed. *In re E.L.*, No. 2-09-0093 (2009) (unpublished order under Illinois Supreme Court Rule 23). Subsequently, on March 3, 2010, the Du Page County circuit court entered an order, over the State and guardian *ad litem*'s objections, terminating the wardship and closing the case.

¶ 5        On August 28, 2018, K.G. left the children with E.L. Sr. to attend a job interview. E.L. Sr. later called K.G. and stated Z.L. had stopped breathing after being fed. E.L. Sr. performed cardiopulmonary resuscitation (CPR), and Z.L. started breathing again. After returning home, K.G. took Z.L. to the pediatrician's office but discovered that it was closed. The doctor, via telephone, advised K.G. to take Z.L. to the emergency room. K.G. did so but left shortly thereafter because the wait was too long and Z.L. seemed to be fine. The next day, K.G. took Z.L. to the pediatrician, and after Z.L. projectile vomited, the doctor told K.G. to take Z.L. to the emergency room. K.G. took Z.L. to Loyola University Medical Center (Loyola). Following a computed tomography scan and magnetic resonance imaging (MRI), Z.L. was diagnosed with subdural and subarachnoid hemorrhages and damage to the corpus callosum, which injuries were consistent with abusive head trauma.

¶ 6         On September 6, 2018, the Department of Children and Family Services (DCFS) removed all four children from the home. Thereafter, the State filed petitions for adjudication of wardship. In the petitions, the State alleged Z.L. was abused due to physical abuse (705 ILCS 405/2-3(2)(i) (West 2018)), abused due to a substantial risk of physical injury (*id.* § 2-3(2)(ii)), neglected due to an injurious environment (*id.* § 2-3(1)(b)), and neglected due to a lack of medical care (*id.* § 2-3(1)(a)). Z.L.'s siblings were each alleged to be abused and neglected due to an injurious environment. The Cook County Public Guardian was appointed as attorney and guardian *ad litem* (GAL) for the children, the Cook County Public Defender was appointed for K.G., and the Public Defender Child Protection Conflict Unit was appointed for E.L. Sr.

¶ 7         A status hearing was held on April 11, 2019. At the hearing, E.L. Sr.'s counsel advised the court that E.L. Sr., who was in court at the time, had moved his residency to Ohio. A social worker also testified with respect to a pending motion for unsupervised visits by K.G. The social worker testified that the children, except Z.L., never presented with any injuries. She also stated the children wanted to visit K.G. and to go home to her. The social worker indicated that K.G. had finished her parenting classes. The State and GAL argued against unsupervised visits, noting K.G. had not yet started therapy and she had not completed parenting coaching. Additionally, individual therapy had been recommended for E.L. Jr. and participation in child-parent psychotherapy (CPP) for N.L. The court stated it needed written recommendations from K.G.'s and the children's therapists before unsupervised visitation could begin.

¶ 8         The adjudicatory hearing began on June 10, 2019. Allison Clemens, a pediatric social worker, first testified on behalf of the State. Clemens spoke with K.G. on August 30, 2018, at Loyola. K.G. told her that she and E.L. Sr. were living together and coparenting the children. Clemens further testified that K.G. stated E.L. Sr. had called her on August 28 and said Z.L. was unresponsive and not breathing. E.L. Sr. then performed CPR, and Z.L. became responsive and started breathing. K.G. told Clemens that, upon arriving home, she contacted the pediatrician and then took Z.L. to the office the next day. After Z.L. projectile vomited, the doctor told K.G. to take her to the emergency room. According to Clemens, when she spoke with K.G., she was cooperative, "pretty upfront," and concerned about Z.L.'s health.

¶ 9            K.G. also told Clemens it was difficult to be at Loyola because she and E.L. Sr. had another child, T.L., die in the same room Z.L. was in. K.G. stated that T.L. was found not breathing while he was sleeping. Clemens contacted DCFS case tracking and was told that T.L.'s case had been indicated against both parents.[1] When Clemens again discussed T.L.'s death with K.G., K.G. told her that both she and E.L. Sr. had been indicated but they had sought an independent autopsy, which showed a birth injury had caused T.L.'s death, not nonaccidental injuries. According to K.G., DCFS issued her an apology and unfounded the allegations. However, when Clemens again contacted DCFS, she was told the case was still indicated. Clemens did not speak with E.L. Sr.

¶ 10          Dr. Manju Akhand, Z.L.'s pediatrician, next testified. Akhand testified that Z.L. was born premature at 26 weeks and was hospitalized until July 18, 2018, due to respiratory and feeding issues, jaundice, and anemia. However, Z.L. improved and was sent home. When Akhand examined Z.L. on July 24, the child was doing well, was gaining weight, and had no breathing difficulties. The exam was normal, and Z.L.'s vitals were stable. On that date, neither parent mentioned any issues or concerns about Z.L. except for mild spit up with feedings, which, according to Akhand, was normal for preemies. Neither parent reported that Z.L. was gasping for breath at any time. Z.L. missed an appointment scheduled for August 24.

¶ 11          On August 28, 2018, K.G. called Akhand and stated Z.L. was gasping for air and had increased vomiting. Akhand advised K.G. "to take the baby to the emergency room." Prior to this time, the parents had not reported Z.L. had a breathing issue or was gasping for breath. On August 29, K.G. brought Z.L. to the pediatrician's office because of persistent vomiting. K.G. advised the doctor she had taken Z.L. to the emergency room the evening before but the child was not seen because Z.L. looked fine and there was a long wait time. K.G. then told Akhand that Z.L. had increased vomiting and problems with breathing for the last couple of days. K.G. stated Z.L. gasped and choked when throwing up, but she did not know if Z.L. stopped breathing. According to the doctor, Z.L. looked fine in her office, Z.L.'s lungs were clear, there was no coughing or wheezing, and there was no indication of dehydration. After Z.L. had projectile vomiting, Akhand advised K.G. to take Z.L. to the emergency room.

---

[1]An indicated report is supported by credible evidence of abuse or neglect.

¶ 12        Dr. Mary Jones, a board-certified child abuse pediatrician and head of the child advocacy team at Loyola, next testified. Jones treated Z.L. in August 2018. According to Jones, Z.L. suffered from bilateral subdural hemorrhages, bilateral subarachnoid hemorrhages, and restricted diffusion in the corpus callosum. After ruling out other possible causes, Jones opined that Z.L. suffered nonaccidental trauma caused by shaking or abusive head trauma.

¶ 13        Jones spoke with K.G. on August 30, 2018. K.G. told Jones that E.L. Sr. had called her while at a job interview and said Z.L. was not moving and he had to administer CPR. K.G. told Jones that when she arrived home Z.L. looked "quiet and fearful." However, she indicated that Z.L. was perfectly normal that morning and did not say anything about additional vomiting or other issues. K.G. told Jones she discussed taking Z.L. to the emergency room with E.L. Sr. but that he said she always panicked and "this is what preemies do. This is why we took CPR." Jones testified that when parents are given CPR classes—and all parents of preemies are required to take such classes before discharge of the child—they are instructed to call 911 when an infant stops breathing.

¶ 14        Jones then described what happens when a baby is shaken. The veins connecting the brain to the dura (one of the coverings of the brain) tear, and bleeding occurs, which creates a space under the dura. Abusive head trauma does not require fracturing and/or bruising, and this condition can be caused by shaking alone. The symptoms include seizures, an altered level of consciousness, and vomiting. Z.L. was reported to have an altered level of consciousness because she stopped breathing, as well as vomiting. Jones stated that projectile vomiting is associated with head trauma.

¶ 15        Jones testified she had never heard of the term "subdural hygromas of infancy" and that the term was not accepted within the field of child abuse pediatrics or pediatrics in general and is not a known condition. Additionally, she stated that low birth weight infants are not prone to subdural hygromas, that she has never seen this, and that this is not accepted as being true in pediatric medicine.

¶ 16        Jones then testified that an intracranial venous thrombosis is a blood clot within a blood vessel in the brain. Z.L. showed no signs of this condition and was not further tested because the findings indicated subdural hemorrhage.

¶ 17 In arriving at her conclusions about Z.L.'s diagnosis, Jones looked at other differential diagnoses, going through each category of possible diagnoses. Based on her level of suspicion, she would recommend further testing or imaging and then rule those conditions out. She ruled out infection, such as meningitis, genetic or congenital conditions, aneurysm, and bleeding disorders because Z.L. had no indication of any of these. Her conclusion that the injury resulted from nonaccidental means, *i.e.*, shaking, was based on the fact that subdural hemorrhages resulting from accidents such as falls occur right at the point of contact but Z.L.'s hemorrhages were diffused and bilateral. In addition, the hemorrhages were not the result of birth trauma because birth trauma hemorrhages occur only in the posterior area of the brain and Z.L.'s were in the frontal area. Moreover, birth traumas usually resolve completely within months after birth. Ultrasounds taken of Z.L. in the neonatal intensive care unit were normal and showed no signs of abnormality or bleeding.

¶ 18 With respect to the finding of restricted diffusion of the corpus callosum,[2] which is a type of damage or compromise to the brain, this was a specific finding a radiologist would comment on. However, a radiologist is not able to tell the clinician what caused it. Possible causes include vascular issues such as infract or hypoxia, toxins, metabolic conditions, carbon dioxide poisoning, infections, trauma, diseases like multiple sclerosis, and stroke. There was no indication of any of these, except for a lack of oxygen when Z.L. stopped breathing (hypoxia). Thus, the likely cause of Z.L.'s restricted diffusion was hypoxia or trauma.

¶ 19 When questioned by the GAL, Jones indicated that, at some point, she learned of T.L.'s death but stated she did not take this into account when making her determination that Z.L. suffered nonaccidental trauma because the signs, symptoms, and history, in and of themselves, were consistent with abusive head trauma.

¶ 20 She also indicated Z.L. showed no sign of venous thrombosis and, even if there was evidence of this, it would not cause the acute bleeding observed in Z.L. She further stated there was no scientific evidence of a connection between venous

[2]The corpus callosum is the bundle of nerve fibers that connect the left and right sides of the brain, allowing communication between the two.

thrombosis and subdural hematomas. If a patient had venous thrombosis, one would see clots in multiple areas of the brain and not just one spot like Z.L.'s images showed.

¶ 21    When questioned by K.G.'s counsel, Jones stated the symptoms that can appear when an infant is a victim of abusive head trauma include retinal hemorrhaging, bone fractures, external injuries to the body, neck injuries, internal organ injuries, and brain injuries, including diffusion and hemorrhages. She reiterated the mechanism here was shaking. Her conclusion was based on the subdural hemorrhages, bilateral subarachnoid hemorrhages, restricted diffusion, a lack of history of any injury or trauma, ruling out differential diagnoses, and consultation with the neurosurgeon.

¶ 22    Dr. Konrad Lebioda, a board-certified radiologist and neuroradiologist, testified next for the State. He reviewed Z.L.'s MRI and identified bilateral subarachnoid hemorrhaging and bilateral subdural hemorrhaging. He also identified cell death in Z.L.'s corpus callosum. He testified that the injury to the corpus callosum was caused by a traumatic injury and not a natural cause or a stroke because this area has a very rich blood supply and so the area "very rarely" suffers from stroke. In addition, he stated it is also very rare for infants to have strokes. Lebioda stated it was difficult to age the blood products in the subdural collections.

¶ 23    Lebioda testified that he has seen intracranial venous thrombosis in his career, including in children, but did not observe any indication of this in Z.L. He noted there are several studies that state venous thrombosis does not cause subdural hemorrhaging. His opinion was that Z.L. suffered traumatic injury. Lebioda did not see any hygromas and explained this was because there would be only one coloration, not mixed coloration as in Z.L.'s images.

¶ 24    Upon examination by K.G.'s attorney, Lebioda acknowledged that stroke could be the cause of restricted diffusion. He further indicated it was not his job to determine whether the injury was the result of accidental or nonaccidental means.

¶ 25    Admitted into evidence on behalf of the State were the original neglect petition for E.L. Jr., the adjudication order finding him neglected, the dispositional order making him a ward of the court, the appellate court's Rule 23 order affirming the neglect finding, the October 30, 2010, Du Page County circuit court order closing

the case, Z.L.'s medical records from Adventist Bolingbrook emergency room indicating that Z.L. left without being seen or treated, Z.L.'s medical records from Access Pediatrics (Dr. Akhand), records from Loyola, and radiograph records from Loyola.

¶ 26    Following presentation of the State's case, K.G. moved for a directed finding, which the trial court denied. K.G. then offered into evidence the pediatrician's records from Z.L.'s three siblings.

¶ 27    Dr. Joseph Scheller, a board-certified pediatric neurologist, then testified on K.G.'s behalf. Scheller was retained by the Cook County Public Defender's office and had spent about 10 hours reviewing Z.L.'s records. He indicated he reviews 50 to 100 suspected abusive head trauma cases a year, that 75 to 80% of his income comes from medical/legal testimony, and that he spends 60% of his time doing medical/legal consulting and 40% of his time seeing or treating patients, both adults and children. He admitted he only sees approximately 8 to 10 children under the age of one per year. He also admitted the last time he diagnosed abusive head trauma was possibly in 1997. Scheller stated he testifies only for defense teams or public defenders in child abuse cases. Scheller did not examine Z.L., nor did he speak to K.G., the social workers, or any of the doctors who treated or saw her.

¶ 28    Scheller opined that Z.L. had subdural hygromas, subdural hematomas, and small blood clots on the surface of the brain. He stated that the injury to the corpus callosum was caused by a stroke and that it and Z.L.'s other injuries were not caused by trauma. According to Scheller, the stroke could have occurred within a couple of days before August 31, 2018. Scheller indicated that the restricted diffusion could be caused by several things: a brain tumor, infection, trauma, or stroke. Here, the MRI showed stroke was the cause.

¶ 29    Scheller testified that "subdural hygroma of infancy" is an accepted pediatric term used in books and articles, but he could not identify any writings in which the term appeared. Scheller admitted that none of the records, tests, or images indicated Z.L. had venous thrombosis.

¶ 30    Scheller testified that the causes of stroke in infants are infection, dehydration, or congenital conditions. Here, the records showed Z.L. vomited and thus could

have become dehydrated. Or Z.L. could have had a congenital tendency that made her blood thicker than normal, though tests for this were not done.

¶ 31    Scheller stated he thought about the cause of the injuries as being a nonaccidental trauma but "sort of tossed out that idea" since Z.L. had no scalp or skull injury, no broken bones, no external injuries, and no neck injuries. According to him, the lack of any of these findings strongly argued against shaken baby syndrome. He opined that Z.L.'s blood clots were caused by dehydration or congenital tendency, but he could not state which. He did not believe Z.L. was a victim of shaking or any kind of impact trauma.

¶ 32    Upon questioning by the State, Scheller acknowledged that a "Consensus Statement on Abusive Head Trauma in Infants and Young Children" was adopted by 15 major national and international professional medical societies and endorsed by many more societies than those listed in that document. However, he disagreed with it. According to Scheller, "It's basically a group of doctors who over diagnose child abuse, patting themselves on the back telling themselves that they always got it right." Scheller did not believe abusive head trauma was a good diagnosis and stated it was vague. Scheller admitted that shaking a young infant can cause subdural hemorrhage, particularly in a child with no neck control or support, like Z.L.

¶ 33    Upon examination by the GAL, Scheller acknowledged one study stated there is no association between subdural hemorrhaging and venous thrombosis. He further acknowledged the medical records indicated that Z.L. was not dehydrated. Additionally, he acknowledged Z.L.'s purported stroke happened in an area where there are many blood vessels and that strokes in infants are rare.

¶ 34    The trial judge then asked Scheller if he had personal, professional, and philosophical differences with colleagues on these issues. He agreed he did, stating he believes child abuse doctors make neurological diagnoses without a neurological background.

¶ 35    The trial court issued its adjudication ruling on July 19, 2019, noting the case was primarily a battle of the experts between Drs. Jones and Lebioda on the one hand and Dr. Scheller on the other. Although the court found all the doctors qualified, it found Jones more persuasive than Scheller and noted that Dr. Scheller

had "certain philosophical differences with the general child abuse field and shaken baby syndrome." The court then stated that Z.L.'s "birth related complications had resolved by the time minor sustained head injuries." The court found Z.L. was physically abused, abused due to a substantial risk of physical injury, neglected due to a lack of necessary care, and neglected due to an injurious environment, as alleged in the petition. The court specifically stated it was not identifying a perpetrator of Z.L.'s abuse. The adjudication order repeated these findings and conclusions. The court also found that E.L. Jr., S.L., and N.L. were neglected due to an injurious environment, noting in the adjudication order they were neglected because their youngest sibling sustained head injuries.

¶ 36       On August 13, 2019, K.G. filed a motion to reconsider the adjudication order, essentially challenging Dr. Jones's opinion. The case was set for November 1, to hear K.G.'s motion to reconsider and for a dispositional hearing. Both were continued until December 20. However, prior to that, because DCFS had learned the minors may have Native American ancestry, the State called E.L. Sr. to testify. E.L. Sr. indicated his grandmother on his mother's side of the family was half Native American but that he did not know the tribe to which she belonged. According to him, the family was in the process of attempting to find out that information. E.L. Sr. indicated he only learned of this after moving to Ohio.

¶ 37       On December 20, 2019, before K.G.'s motion to reconsider was heard or the dispositional hearing took place, the State indicated it had sent notice to the Bureau of Indian Affairs as required by the Indian Child Welfare Act. Glenda L., the children's paternal grandmother and foster parent, testified her grandmother had Native American ancestry but she did not know to which tribe she might belong nor whether she was a member. Glover L., the paternal grandfather and foster parent, testified that his great aunt, whose name he did not know, had Native American ancestry, but he too did not know to which tribe she might belong. At a later hearing, Glover L. advised the court the tribe was the Iroquois.

¶ 38       Following this testimony, the trial court heard argument on K.G.'s motion to reconsider the adjudicatory orders. The motion was denied.

¶ 39       At the outset of the dispositional hearing, the court admitted into evidence exhibits offered by the State including a December 6, 2018, integrated assessment prepared by former caseworkers, a December 15, 2019, report prepared by the

current caseworker, a September 10, 2019, discharge summary from K.G.'s individual therapist, a psychology department referral form for K.G.'s parenting capacity assessment, a September 12, 2019, referral for parenting capacity assessment, a November 19, 2018, certification of completion of child management parenting training class for K.G., and a certificate of completion of child management parenting training seminar for E.L. Sr.

¶ 40      Capri Woodford-Johnson, the social worker on the case since October 19, 2019, then testified. Woodford-Johnson stated that the four children had been residing with their paternal grandparents since the case began. E.L. Jr. was 14 years old and in the eighth grade. In November 2019, he was suspended from school for three days because he was swearing at teachers and disruptive. Such behavior had been escalating in the last few weeks. The school progress report noted E.L. Jr.'s behavior had caused his grades to drop. Currently, he had a few Ds and Fs on his report card. The report indicated his misbehavior hindered his progress, he had missing assignments, he was doing poorly because he refused to take tests, and he was disrespectful and disruptive in class. E.L. Jr. also had started to become angrier with DCFS's involvement. He additionally had issues with his father expressing to Woodford-Johnson that, if there was someone to be afraid of, it was E.L. Sr., not K.G. Further, E.L. Jr. stated that his father smoked a lot of marijuana. However, E.L. Jr. still wished to visit with him. E.L. Jr. told Woodford-Johnson he wanted to go home but did not specify if this was with K.G. or E.L. Sr. It was Woodford-Johnson's belief that E.L. Jr. was very frustrated and needed "pretty intense" therapy. Although he was currently in therapy, Woodford-Johnson was unsure of whether the above issues were being addressed, as she had not been able to speak with the therapist. E.L. Jr. did not feel he needed therapy, and Woodford-Johnson did not believe he was very open during sessions.

¶ 41      Nine-year-old S.L., who was in the fourth grade, had also received a few Ds and Fs due to missing assignments. However, when Woodford-Johnson spoke with the grandparents, they indicated S.L. had caught up, the issue was resolved, and that S.L. was doing fine. S.L. was also in individual therapy.

¶ 42      Five-year-old N.L., who was in kindergarten, was on target and doing well. N.L. had no behavioral issues and was not undergoing any services.

¶ 43    One-year-old Z.L. was not developing on target. There were concerns regarding cognitive ability and gross motor skills, and Woodford-Johnson believed Z.L. could benefit from some services. Z.L. also had medical conditions due to the brain injuries that were sustained. Z.L. was being seen by several specialists, including a neonatologist and ophthalmologist, and was also being monitored by a neurologist.

¶ 44    Woodford-Johnson described an event that occurred on November 23, 2019, in which the police were called to the foster parents' home. K.G. became upset when E.L. Jr. did not want to attend the visit. She began pounding on the door and yelling disrespectful things. Woodford-Johnson spoke with E.L. Jr. after the incident, and he was upset because of the tension between K.G. and the foster parents. Woodford-Johnson believed E.L. Jr. thought he was caught in the middle.

¶ 45    Woodford-Johnson testified that K.G. completed therapy in August 2019 but did not believe issues regarding this case were addressed. In addition, K.G. did not acknowledge during therapy that Z.L. had been abused, nor did she accept any responsibility for Z.L.'s injuries. Further, the therapist K.G. was seeing did not address her failure to protect Z.L. K.G. had only recently spoken with Woodford-Johnson's supervisor about the possibility that Z.L.'s injuries were not accidental. K.G. had completed her parenting classes but had not begun the parenting capacity assessment. Woodford-Johnson indicated this assessment needed to be completed so DCFS could ascertain whether K.G. needed additional therapy and whether she was able to keep the children safe. During three sessions of the parenting classes, K.G. engaged with her children and displayed appropriate behavior toward them. There had been no reports of possible risks to the children's safety while they were with K.G. The children were bonded with K.G., were happy to see her, and wanted to spend time with her. K.G. expressed to Woodford-Johnson that the foster parents made false claims about her visits and interfered with her bonding with the children.

¶ 46    Woodford-Johnson testified that E.L. Sr. had completed parenting classes but had not completed other services. Woodford-Johnson stated she was attempting to obtain therapy for E.L. Sr. in Ohio but that he was only willing to attend one session even though he had been told he could not regain custody without completing the services. E.L. Sr. indicated he was interested in regaining custody of the children. He visited the children as often as possible, at least once a month, and his parents supervised the visits. He had a good relationship with the children.

¶ 47    Woodford-Johnson recommended that the DCFS guardianship administrator be appointed as guardian for the children to allow the parents time to engage in services.

¶ 48    The trial court found K.G. and E.L. Sr. unable, but not unfit, to parent their children and entered a dispositional order making the children wards of the court and appointing the DCFS guardianship administrator as guardian. The court instructed the agency to review the services and individual therapy still needed for all involved and noted the parenting capacity assessment for K.G. "may, in fact, be appropriate." The court granted DCFS discretion to allow K.G. unsupervised visits with the children after a review of services and if the therapists agreed. The court also believed a review of the current placement was needed or, at the least, some adjustments needed to be made. The court was not satisfied with the progress of the children. Additionally, the court indicated it had reservations about the completeness of K.G.'s therapy and believed further services were necessary.

¶ 49    All parties agreed with a permanency goal of returning home within 12 months. The court then commended K.G. on her progress but did not make a finding of "substantial progress." However, the court stated she was "getting close." The court did not believe E.L. Sr. had made any progress.

¶ 50    K.G. appealed the adjudicatory and dispositional orders. Before the appellate court, the parties agreed the cause had to be remanded for compliance with the Indian Child Welfare Act. 2020 IL App (1st) 200151, ¶ 22. According to the appellate court, it therefore had to decide what instructions were necessary upon remand. *Id.* ¶ 24. The State argued that, if there were no tribal interest, the trial court should reinstate its judgment. Conversely, K.G. argued the appellate court should reverse the finding of unfitness and direct the trial court to enter an order that the State failed to prove neglect and abuse. *Id.* The appellate court agreed with K.G.

¶ 51    With respect to the adjudicatory order and findings of neglect, the appellate court found the State offered no evidence of the parents' treatment of Z.L. or her siblings that would justify their removal. According to the appellate court, the State relied exclusively on the doctrine of anticipatory neglect. *Id.* ¶ 26. Citing *In re Zion*, 2015 IL App (1st) 151119, the appellate court then stated that, under the doctrine of anticipatory neglect, it had to evaluate the individual with whom the children will live. 2020 IL App (1st) 200151, ¶ 27. Because E.L. Sr. had moved from the

- 13 -

home, the appellate court looked primarily to evidence regarding K.G.'s treatment of the children. *Id.* ¶ 28. Social workers testified the children fared well in K.G.'s care; they were healthy and did reasonably well in school. *Id.* K.G. interacted appropriately with them, and they wanted to be returned to her. *Id.* According to the appellate court, the trial court found K.G. neglected the children when she went to a job interview and left them in E.L. Sr.'s care. *Id.* However, the trial court did not find K.G. shook Z.L., and the State offered no evidence that, in the years prior to Z.L.'s birth, there was anything that should have alerted her she was putting the children at risk by leaving them with E.L. Sr. *Id.* The appellate court found the case similar to *Zion*, wherein the court focused on the fact the boyfriend, who had perpetrated the neglect and abuse of Zion's siblings, no longer lived in the home, and concluded the State failed to prove anticipatory neglect. *Id.* ¶¶ 29-30.

¶ 52 The appellate court also found guidance from this court's decision in *In re A.P.*, 2012 IL 113875, ¶ 23, where a child's face was burned with hot water while in the care of the mother's boyfriend. *Zion*, 2015 IL App (1st) 151119, ¶ 31. In that case, the trial court held the State had proven neglect. *In re A.P.*, 2012 IL 113875, ¶ 1. We rejected that determination because it was not the mother who was found to have left the children unsupervised but the boyfriend. *Id.* ¶ 26. Thus, to find neglect, the State had to establish the mother knew or should have known the boyfriend was an unsuitable caregiver. *Id.* ¶ 25. There was, however, no evidence of that. *Id.* In the case *sub judice*, according to the appellate court, the State relied solely on the death of T.L. to show K.G. should have known she was imperiling the children by leaving them with E.L. Sr. 2020 IL App (1st) 200151, ¶ 32. However, the appellate court noted that the second autopsy of T.L. showed there was no wrongdoing—a fact the State did not contest—and therefore, the appellate court could not say K.G. was on notice she was putting the children in peril by leaving them with E.L. Sr. *Id.* Also, because E.L. Sr. no longer lived in the home, evidence that he may have injured Z.L. did not show K.G. neglected or abused the children. *Id.* Thus, according to the appellate court, the State failed to prove neglect or abuse of any of the children. *Id.*

¶ 53 In denying rehearing, the appellate court noted the State and GAL argued it should not have considered evidence offered at the dispositional hearing to review the adjudicatory findings of neglect and abuse. *Id.* ¶ 35. The appellate court disagreed, finding the evidence concerned conditions prior to the State's

intervention and was relevant to whether the children were living in an injurious environment. *Id.* ¶ 36. The appellate court also found that, after learning E.L. Sr. had moved out, the trial court should have reconsidered its initial adjudication of neglect in light of the changed circumstances. *Id.* ¶ 37. According to the appellate court, after E.L. Sr. moved, the case became very similar to *A.P.*, and as in that case, there was no evidence K.G. participated in neglectful or abusive acts. *Id.* ¶ 38. The appellate court stated the trial court could only find neglect if it found K.G. acted negligently by leaving her children in the care of the person who neglected or abused them. *Id.*

¶ 54        The GAL also argued on rehearing that the State proved K.G. had neglected Z.L.'s medical needs on August 28 because she should have called 911 when she found out Z.L. had stopped breathing. *Id.* ¶ 41. According to the appellate court, the State presented no evidence as to what actions such a call would have prompted or how it would have led to treatment other than advice to take K.G. to the emergency room. *Id.* Because K.G. took the medical steps she would have taken if she had called 911, the appellate court found the lack of a call did not equate to medical neglect. *Id.*

¶ 55        The appellate court then held that, under the Act, before final judgment, if new evidence shows the court need not remove the children, the court should revisit its initial adjudication. *Id.* ¶ 45. According to the appellate court, the trial court should have done so here in light of the fact the evidence showed that the children fared well in K.G.'s care before August 28, 2018, that she personally never neglected them, and that E.L. Sr. was gone from the home. *Id.* In the view of the appellate court, the evidence did not justify removal. *Id.* For these reasons, the appellate court vacated the trial court order and remanded the cause to permit proper notification pursuant to the Indian Child Welfare Act. *Id.* ¶ 48.

¶ 56        We granted the GAL's petition for leave to appeal on behalf of the minors. Ill. S. Ct. R. 315(a) (eff. Oct. 1, 2020). We also granted the State's motion to align itself as appellant along with the minors. In addition, we granted Legal Aid Chicago, Ascent Justice, Cabrini Green Legal Aid, the Chicago Coalition for the Homeless, the Chicago Lawyer's Committee for Civil Rights, Equip for Equality, Land of Lincoln Legal Aid, Life Span, Prairie State Legal Services, the Shriver Center on Poverty Law, the Women's Justice Institute, the Center for Integrity in

Forensic Sciences, the Family Justice Recourse Center, the Center on Wrongful Convictions, and the Illinois Innocence Project leave to submit *amici curiae* briefs in support of K.G.'s position. Ill. S. Ct. R. 345 (eff. Sept. 20, 2010).[3]

¶ 57                                    ANALYSIS

¶ 58         "A proceeding for adjudication of wardship 'represents a significant intrusion into the sanctity of the family which should not be undertaken lightly.' [Citation.]" *In re Arthur H.*, 212 Ill. 2d 441, 463 (2004). In proceedings under the Act, the paramount consideration is the best interests of the child. *In re A.P.*, 2012 IL 113875, ¶ 18. "[C]ases involving allegations of neglect and adjudication of wardship are *sui generis*, and must be decided on the basis of their unique circumstances." *In re Arthur H.*, 212 Ill. 2d at 463. The Act sets forth the procedures the trial court must follow in determining whether a minor should be removed from his or her parents' custody and made a ward of the court. *In re A.P.*, 2012 IL 113875, ¶ 18. The trial court must employ a two-step process to make this determination. *Id.*

¶ 59         Step one is the adjudicatory hearing on the petition for adjudication of wardship. *Id.* ¶ 19. At the adjudicatory hearing, "the court shall first consider only the question whether the minor is abused, neglected or dependent." 705 ILCS 405/2-18(1) (West 2018). "The only question to be resolved at an adjudicatory hearing is whether or not a child is neglected, and not whether every parent is neglectful." *In re Arthur H.*, 212 Ill. 2d at 467.

¶ 60         If the trial court determines that a minor is abused or neglected at the adjudicatory hearing, the court then moves to step two, which is the dispositional hearing. 705 ILCS 405/2-21(2) (West 2018). At the dispositional hearing, the trial court determines whether it is consistent with the health, safety, and best interests of the minor and the public that the minor be made a ward of the court. *Id.* At this point, the trial court may consider the acts and/or omissions of the parents. *In re Arthur H.*, 212 Ill. 2d at 466.

---

[3]E.L. Sr. is not part of this appeal.

¶ 61 The State has the burden to prove allegations of abuse or neglect by a preponderance of the evidence. *In re A.P.*, 2012 IL 113875, ¶ 17. Specifically, the State must establish the allegations are more probably true than not. *Id.* We will not disturb the trial court's finding of abuse or neglect unless it is against the manifest weight of the evidence. *Id.* A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *Id.* If the State fails to prove the allegations of abuse or neglect by a preponderance of the evidence, the trial court must dismiss the petition. *Id.*

¶ 62                               Abuse and Neglect Findings

¶ 63 The State and the GAL both argue the appellate court erred in reversing the trial court's order finding the minors neglected and abused. The State and the GAL contend that the appellate court's consideration of whether K.G. was personally responsible for Z.L.'s injuries and the fact E.L. Sr. had moved from the home was at odds with the Act and this court's holding in *Arthur H.* The State and the GAL emphasize that the trial court here found that Z.L. was abused due to sustained brain injuries unrelated to any premature birth conditions and that the siblings were neglected because they lived with and were exposed to the environment in which Z.L. sustained the injuries. According to the State and the GAL, the trial court properly focused on the question before it, while the appellate court improperly focused on who was to blame for those injuries.

¶ 64 K.G., in response, contends the appellate court correctly reversed the trial court's order finding the minors abused and neglected. In support of this contention, K.G. initially asserts that this court must overrule our "sweeping incorrect statements" in *Arthur H.* and clarify that the State must show both some injury to the minor, *i.e.*, abuse or neglect, *and* that the injury was the result of some act or omission by *each* custodial parent at the adjudicatory stage. Because that showing was not made here, K.G. maintains the appellate court's judgment was correct.

¶ 65 We reject K.G.'s argument that the trial court must determine that the acts or omissions of each custodial parent caused the abuse or neglect. In *Arthur H.*, we concluded that the appellate court's consideration of the relative blame of each parent for the child's neglect at the adjudicatory stage was error. *In re Arthur H.*, 212 Ill. 2d at 465. In so holding, we expressly rejected the requirement that both

- 17 -

parents, or all persons responsible for the welfare of the minor, must be found to have engaged in acts or omissions that constitute neglect in order to find a minor neglected at the adjudicatory stage. *Id.* As we stated in *Arthur H.*,

> "[a] contrary result would lead to the unacceptable proposition that a child who is neglected by only one parent would be without the protections of the Act. Similarly, a child would have no protection under the Act if the child were neglected, but it could not be determined which parent's conduct caused the neglect." *Id.* at 467.

¶ 66 Additionally, we reject K.G.'s argument that fault, or culpability for an injury, must be evaluated at the adjudicatory stage. In *Arthur H.*, we agreed with the State's contention that the appellate majority erred in looking to the culpability of a parent at the adjudicatory stage because such a conclusion was contrary to the provisions of the Act. *Id.* at 465. We explained that "[t]he plain language of [section 1-3(1)] instructs the circuit court to focus solely upon whether the child has been neglected," and we noted that "[t]he legislature made no mention in this provision that during the adjudicatory stage of the proceedings the circuit court is also to determine who may be responsible for the child's neglect, and to assess the proportion of the blame with respect to such individuals." *Id.*

¶ 67 In addition, this court further observed that, in defining neglect in section 2-3, the legislature focused exclusively on the status of the child and gave no consideration to an evaluation of the acts or omissions of the parents or any other individual responsible for the welfare of the child, in arriving at a determination of neglect. *Id.* at 466. Moreover, under section 2-21, we concluded there was no directive from the legislature that the circuit court shall consider the acts of the parents in making a determination of neglect: "[i]t is only *after* the circuit court has adjudicated the child neglected that the statute directs the court to consider the actions of the parents. Even then, however, section 2-21 provides that the court need consider such actions only 'to the extent possible.' " (Emphasis in original.) *Id.*

¶ 68 Thereafter, we explained:

> "Our holding that the Act instructs the circuit court during the adjudicatory hearing to determine whether the child is neglected, and not whether the parents

are neglectful, furthers the purpose and policy of the Juvenile Court Act, which is to ensure the best interests and safety of the child. 705 ILCS 405/1-2 (West 2000)." *Id.* at 467.

¶ 69 Finally, we stated, " '[t]he basic principle overlooked by the [appellate court] is that parents are not adjudicated neglectful at the adjudicatory stage of the proceedings under the Act; rather, minors are adjudicated neglected.' " *Id.* Accordingly, we held that the " 'only question to be resolved at an adjudicatory hearing is whether or not a child is neglected, and not whether every parent is neglectful.' " *Id.* (quoting *In re Arthur H.*, 338 Ill. App. 3d 1027, 1042 (2003) (Kapala, J., dissenting)); see also *In re A.P.*, 2012 IL 113875, ¶ 20.

¶ 70 Contrary to K.G.'s contention that *Arthur H*. contains "sweeping incorrect statements," the opinion was supported by the plain language of the relevant statutory provisions, as well as the policy and purpose underlying the Act. K.G. has offered no valid argument or rationale why principles of *stare decisis* should be set aside and this court should depart from the holding of *Arthur H*.

¶ 71 Here, the appellate court incorrectly looked to K.G.'s culpability, or lack thereof, in reversing the trial court's findings of abuse and neglect. This was contrary to the clear holding in *Arthur H*. and was error. In addition, the appellate court committed other factual and analytical errors.

¶ 72 First, the appellate court found the State relied "exclusively" on the doctrine of anticipatory neglect with respect to Z.L.'s siblings. This is incorrect. While the State did allege that T.L.'s death and the previous involvement of the parents with DCFS were relevant to the application of the doctrine of anticipatory neglect, the State also relied on the fact the siblings were present in the home when Z.L. sustained injuries—a factual allegation that is irrelevant to the anticipatory neglect doctrine. More importantly, the trial court did not make any finding regarding anticipatory neglect. There was no finding that Z.L. or Z.L.'s siblings were neglected based on the prior death of T.L. and the prior finding of neglect against the parents. The appellate court here erroneously focused entirely on the anticipatory neglect doctrine.

¶ 73 Second, the appellate court focused upon the testimony of "social workers" to find K.G. was not neglectful. However, a review of the record discloses this

testimony was neither available nor presented at the time of the adjudicatory hearing and related solely to the time frame *after* the State's intervention, not at the time of or prior to its intervention. This is shown by the language the appellate court itself used. The court noted that K.G. interacted appropriately with the children (clearly indicating they were being observed by someone) and they wanted to *return* home. 2020 IL App (1st) 200151, ¶ 28.

¶ 74     Third, the appellate court erroneously stated the trial court found K.G. neglected the children when she went to the job interview and left the children in E.L. Sr.'s care. The trial court made no such finding, either orally or in its written order.

¶ 75     Fourth, the appellate court's reliance on *In re Zion* and *In re A.P.* is misplaced. *In re Zion*, 2015 IL App (1st) 151119, involved a purely anticipatory neglect situation since the minor at issue had not been born at the time of the incident. Moreover, the boyfriend was specifically found to have been the perpetrator at the adjudicatory hearing, not the mother, and he no longer lived in the home at the time of the minor's birth. The case *sub judice* is not a purely anticipatory neglect situation. And here, each of the siblings was born, lived in the home with both parents at the time of Z.L.'s injuries, and was present when the injuries occurred.

¶ 76     In *In re A.P.*, 2012 IL 113875, ¶¶ 1, 3, two minors were adjudicated neglected due to an injurious environment after the mother's boyfriend, who was babysitting the children in his home, caused a burn injury to one minor's face. At the dispositional hearing, the trial court found the mother fit and closed the case. *Id.* ¶ 1. The appellate court reversed the finding of neglect. *Id.* Before this court, the State argued that the appellate court improperly relied on evidence that the mother did not know her boyfriend would act neglectfully while watching the children and that she acted appropriately after the incident. The State maintained that this conflicted with *Arthur H*. *Id.* ¶ 16. We rejected this argument and affirmed the judgment of the appellate court. *Id.* ¶ 29.

¶ 77     In so doing, this court reiterated that the plain language of section 2-18(1) of the Act directs the trial court to focus solely on whether the child is abused or neglected and makes no mention of determining fault and assessing blame. *Id.* ¶ 19. However, we determined the State's argument that under *Arthur H.* it "can obtain a finding of neglect due to a babysitter leaving a child unattended, resulting in

injury, even without a showing of any knowledge by the parents that the babysitter was an unsuitable caregiver is misplaced." *Id.* ¶ 24. Specifically,

> "[t]he State's interpretation of the Act would, in essence, allow a finding of neglect due to an injurious environment *whenever* an injury to a minor could be attributed to improper supervision on the part of a selected caregiver, even in the case of the most conscientious parent who has exerted every reasonable effort in choosing a competent caregiver for his or her child." (Emphasis in original). *Id.*

We then stated that, in contrast to *Arthur H.*, "there is no issue of apportioning culpability between the parents in this case because neither of them directly contributed to A.P.'s injury which was the basis of the trial court's neglect finding." *Id.* ¶ 25. As such,

> "[u]nder the circumstances in this case, it would not be possible to focus on the status of [the minors], as *Arthur H.* instructs, and determine whether they had been neglected, without considering [the mother's] decision in choosing to have [her boyfriend] babysit the minors. Simply put, in order to support the trial court's neglect finding in this case, there had to be some indication that [the mother] knew or should have known that [the boyfriend] was an unsuitable caregiver." *Id.*

We concluded there was no such evidence. *Id.* ¶ 26. There was no indication the boyfriend was unsuitable, there was no indication he had previously injured the children, immediately upon learning of the incident the mother brought the minor to the emergency room, and there was no evidence there was further contact between the boyfriend and the minors. *Id.*

¶ 78    The factual scenario in *In re A.P.* is clearly distinct from the factual scenario presented here. In *In re A.P.*, blame was assigned to the boyfriend, not the mother, at the adjudicatory hearing. Here, in contrast, the trial court repeatedly stated it was not identifying a perpetrator. Additionally, there was no issue of apportionment in *In re A.P.* because neither parent was present at the time of the injury. Here, one of the parents had to have at some point contributed to the injury, whether it was E.L. Sr. on August 28, 2018, or K.G. sometime at or near that date. Moreover, the injuries in *In re A.P.* occurred in the boyfriend's home, not the family home where

all of the children lived, as is the case here. Lastly, there is a significant difference between a babysitter or caregiver, such as at issue in *In re A.P.*, and a custodial parent. With respect to the former, a parent makes a conscious choice to retain someone to take care of their child and exerts efforts to find someone to do so. *In re A.P.* gave examples such as teachers, nannies, camp counselors, or health care workers in a myriad of environments including day cares, schools, churches, and medical facilities. *Id.* ¶ 24. The rule applied in *In re A.P.* related to someone other than a custodial parent. The rule does not apply in the situation presented here, and the appellate court erroneously relied upon *In re A.P.* to support its conclusion.

¶ 79        Fifth, the appellate court concluded that the trial court should have reconsidered its "initial adjudication of neglect" in light of the "changed circumstance" that E.L. Sr. had moved out of the home. However, this ignores the facts presented. E.L. Sr. had moved from the home at least by April 2019, prior to June 10, 2019, when the adjudication hearing began. As such, E.L. Sr. was not in the home at the time the trial court made its "initial" finding of neglect and, therefore, there were no changed circumstances to reconsider. Additionally, the fact E.L. Sr. was not in the home subsequent to the children's removal is irrelevant to the allegations of the petition and the basis for removal, *i.e.*, that Z.L. sustained injuries on August 28, 2018, while in his care. Certainly, the fact he had moved does not absolve or erase the facts triggering the State's intervention and removal. See *In re Kenneth D.*, 364 Ill. App. 3d 797, 805 (2006) ("test for admissibility of postpetition evidence will depend on whether it is relevant to the allegations in the petition").

¶ 80        Accordingly, we conclude the appellate court misapplied the law and facts and erred in reversing the trial court's order finding the minors abused and neglected.

¶ 81        K.G. contends, however, that apart from any errors committed by the appellate court, the trial court's adjudicatory order finding the minors abused and neglected must still be reversed. With respect to Z.L., K.G. maintains the State failed to establish Z.L. was a victim of abusive head trauma. In this regard, K.G. argues the trial court erred in favoring the testimony of Dr. Jones over Dr. Scheller. Also, according to K.G., the trial court's finding that Z.L.'s birth issues had resolved was contrary to the evidence. We disagree.

¶ 82        The trial judge is in the best position to resolve conflicts in expert testimony and determine their credibility. *Flynn v. Cohn*, 154 Ill. 2d 160, 169 (1992). Under

the manifest weight standard, a trial court's decision in a bench trial is subject to considerable deference. *Samour, Inc. v. Board of Election Commissioners of the City of Chicago*, 224 Ill. 2d 530, 548 (2007). A reviewing court must not substitute its judgment for that of the trier of fact. *Id.* Here, the trial judge found both Dr. Jones and Dr. Scheller qualified but found Dr. Jones's testimony more persuasive. After thoroughly reviewing the testimony of each, we cannot say an opposite conclusion on credibility or persuasiveness is clearly evident.

¶ 83    Additionally, we cannot say the trial court's finding that Z.L.'s birth issues had resolved by the time of the head injuries was against the manifest weight of the evidence. Dr. Akhand, Z.L.'s pediatrician, testified that Z.L. was released from the hospital because she was doing better. Z.L. was not released with any medications or directions for further care related to birth-related complications. Additionally, Dr. Akhand testified that, as of July 24, Z.L. was doing well and had no breathing issues, and neither parent had expressed any concerns except for mild spit-up. Moreover, prior to August 28, neither parent reported any breathing issues or that Z.L. had been gasping for air. K.G. herself told Dr. Jones that Z.L. was "perfectly normal" on the morning of August 28 and did not express to her any concerns or issues prior to that time. As such, there is no evidence Z.L. still suffered from birth-related complications and the trial court's finding is not against the manifest weight of the evidence.

¶ 84    Based on the foregoing, we cannot say the State failed to prove Z.L. was a victim of abusive head trauma, nor can we conclude that the trial court's finding that Z.L. was physically abused was against the manifest weight of the evidence.

¶ 85    With respect to Z.L., the GAL also argues the appellate court improperly reversed the finding of medical neglect. We agree. The trial court found Z.L. neglected due to the lack of medical care but did not identify any specific facts for this conclusion. In reviewing this finding, the appellate court concluded that the State presented no evidence as to what actions a call to 911 would have prompted or what treatment it would have led to. For that reason, according to the appellate court, the finding of neglect had to be reversed. We disagree. If either parent had called 911, an ambulance would have been dispatched to the home. A call to 911 regarding an infant not breathing would not be ignored. Thus, at a minimum, Z.L. would have been examined and evaluated by paramedics and perhaps transported

- 23 -

to the hospital. As such, we disagree with the appellate court's finding that a lack of a call to 911, by itself, is sufficient to reverse the trial court's finding of medical neglect.

¶ 86     K.G. further contends the findings of neglect against Z.L.'s siblings were against the manifest weight of the evidence. According to K.G., the trial court made its findings of neglect without identifying the improper acts or omissions of the parents and, therefore, it is impossible to analyze the level of risk to the siblings. Further, in K.G.'s view, the siblings suffered no actual injury, so the State's only possible theory was anticipatory neglect. K.G. asserts the State presented no evidence of the conditions of the siblings and no evidence K.G. had reason to know the potential risk of leaving the children with E.L. Sr. Further, a decade had passed since T.L.'s death, and there was no evidence indicating the children were not properly cared for during that time. We reject K.G.'s argument.

¶ 87     Like the appellate court, K.G. rests her argument solely on the erroneous assumption that the State relied exclusively on the anticipatory neglect doctrine. K.G., like the appellate court, ignores the fact that the trial court found the siblings neglected based on the head injuries sustained by Z.L. The trial court did not make any finding that Z.L.'s siblings were neglected based on the prior death of T.L. and the prior finding of neglect against the parents. As such, K.G.'s arguments are without merit. For the reasons explained above, her culpability and knowledge, or lack thereof, are irrelevant to the trial court's actual basis for its conclusion. Moreover, under the Act, proof of abuse or neglect of one minor is admissible on the issue of abuse or neglect of other minors for whom the parents are responsible. 705 ILCS 405/2-18(3) (West 2018); see also *In re R.G.*, 2012 IL App (1st) 120193, ¶ 51 (evidence of physical abuse of one minor supported neglect due to an injurious environment finding of another minor who lived in the same home and for whom both parents were responsible). Based on the foregoing, we cannot say the trial court's findings of neglect with regard to the siblings were against the manifest weight of the evidence.

¶ 88     Finally, we note that K.G. asks this court to declare the "injurious environment" category of neglect (705 ILCS 405/2-3(1)(b) (West 2018)) unconstitutionally vague. K.G. contends that this category does not provide for fair notice of the conduct proscribed and invites idiosyncratic enforcement by judges and the State.

K.G. forfeited this issue because she failed to raise it below. *In re Liquidations of Reserve Insurance Co.*, 122 Ill. 2d 555, 567-68 (1988) (finding a constitutional challenge raised for first time on appeal forfeited). However, given the fundamental liberty interest of a parent to raise and care for her children as protected by the United States Constitution (*In re Br. M.*, 2021 IL 125969, ¶ 40), we will overlook K.G.'s forfeiture.

¶ 89    We disagree with K.G.'s contention. We have stated the term "injurious environment" cannot be "defined with particularity," but it includes the breach of a parent's duty to ensure a safe and nurturing shelter for his or her children. *In re Arthur H.*, 212 Ill. 2d at 463. "[C]ases involving allegations of neglect and adjudication of wardship are *sui generis*, and must be decided on the basis of their unique circumstances." *Id.* This fact underscores the " 'fact-driven nature of neglect and injurious environment rulings.' " *Id.* (quoting *In re N.B.*, 191 Ill. 2d 338, 346 (2000)).

¶ 90    In *People v. Schoos*, 15 Ill. App. 3d 964 (1973), the appellate court rejected the specific arguments raised here: that the injurious environment category was unconstitutionally vague because it lacked adequate notice of what parental acts were proscribed and allowed selective and discriminatory enforcement by the State and courts. *Id.* at 965-66. The court pointed out that the United States Supreme Court had held that a statute need not be more specific than is possible under the circumstances. *Id.* at 966. Specifically, " '[t]he test is whether the language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." *Id.* (quoting *Jordan v. De George*, 341 U.S. 223, 231-32 (1951)). "Child neglect is by its very nature incapable of a precise and detailed definition ***." *Id.* at 967.

¶ 91    The court in *Schoos* also concluded the State has a "compelling interest to protect children from abuse and neglect, and to narrow the statute would have the effect of diminishing the rights of children who have no other means of protecting themselves." *Id.* Additionally, the court posited that "child neglect laws of Illinois have been in existence for over seventy years, and while the passage of time is not conclusive as to the validity and the constitutionality of a statute, it creates a strong presumption against its invalidity." *Id.* Accordingly, the court concluded that the term injurious environment was not unconstitutionally vague. *Id.* We agree with the

- 25 -

conclusion reached in *Schoos* and find the term injurious environment is not unconstitutionally vague. Accordingly, we reject K.G.'s argument.

¶ 92    For the foregoing reasons, we reverse the judgment of the appellate court reversing the trial court order finding the minors abused and neglected.

¶ 93                                 Dispositional Hearing

¶ 94    The GAL also contends we should affirm the trial court's dispositional order. The appellate court did not address the dispositional order, but according to the GAL, this court should do so in the interests of judicial economy since the issue was fully briefed before the appellate court and the case has been pending for three years. The GAL maintains the manifest weight of the evidence supports the trial court's findings since K.G. had outstanding services to complete.

¶ 95    K.G. contends the trial court erred in finding her unfit.[4] K.G. maintains she was fit, willing, and able to care for her children at the time of the dispositional hearing and, as such, the trial court should have dismissed the petition or, once it learned E.L. Sr. was no longer in the home, revisited its adjudicatory hearing findings and returned the children to her. According to K.G., DCFS considered her to have completed all services except a parenting capacity assessment. The evidence showed her therapy was sufficient to address the concerns regarding why the case came into the system, and she successfully completed parenting classes. Thus, according to K.G., the trial court's dispositional order should be reversed. We reject K.G.'s arguments.

¶ 96    The trial court conscientiously took into account all of the evidence presented at the dispositional hearing, including Woodford-Johnson's testimony that she believed E.L. Jr. needed additional therapy and that a parenting capacity assessment was necessary to ascertain whether K.G. needed additional therapy and whether she was able to keep the children safe. During the hearing, the court requested DCFS to follow up on certain matters that needed to be addressed or answered, including additional possible services for the children and individual therapy for all involved.

---

[4]The trial court did not find K.G. unfit; it found her unable.

The trial court was of the opinion, based on Woodford-Johnson's testimony and the court report dated December 15, 2019, that further services were necessary. Despite this, the court commended K.G. on the progress she had made and stated she was "getting close." Having reviewed the evidence presented at the dispositional hearing, we find the trial court's conclusion that K.G. was unable, at that time, to parent the children was not against the manifest weight of the evidence. Accordingly, we affirm the trial court's dispositional order.

¶ 97                                     Indian Child Welfare Act

¶ 98        The GAL contends that, if we reverse the appellate court's decision, we will need to remand this cause to determine whether there was compliance with the Indian Child Welfare Act. According to the GAL, is it unclear why the appellate court remanded for compliance with this act since it vacated the trial court's order finding abuse and neglect. Therefore, the petitions would have been dismissed, and Native American notification would be moot. Neither the State nor K.G. addresses this issue.

¶ 99        We agree with the GAL that this case must be remanded for proof of compliance with the Indian Child Welfare Act. Although the record discloses that the State sent notification to the Bureau of Indian Affairs on December 20, 2019, there is no evidence as to what has transpired in connection with this notice since that time. Accordingly, remand is necessary.

¶ 100                                     CONCLUSION

¶ 101        For the foregoing reasons, the judgment of the appellate court, reversing the trial court's order finding abuse and neglect is reversed. The judgment of the appellate court remanding for compliance with the Indian Child Welfare Act is affirmed. The judgment of the circuit court is affirmed.

¶ 102        Appellate court judgment affirmed in part and reversed in part.

¶ 103        Circuit court judgment affirmed.

¶ 104    Cause remanded.