**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 210375-U

Order filed March 9, 2023

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| *In re* M.L. and J.D., | ) | Appeal from the Circuit Court |
| | ) | of the 10th Judicial Circuit, |
| Minors, | ) | Tazewell County, Illinois. |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | Appeal Nos. 3-21-0375, 3-21-0376 |
| Petitioner-Appellee, | ) | Circuit Nos. 20-JA-260, 20-JA-261 |
| | ) | |
| v. | ) | |
| | ) | |
| Amber N.L., | ) | The Honorable |
| | ) | Mark E. Gilles, |
| Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE McDADE delivered the judgment of the court.
Justices Albrecht and Hettel concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The circuit court's finding that the State proved by a preponderance of the evidence that respondent's minor children were neglected was not against the manifest weight of the evidence.

¶ 2     The State filed amended shelter care petitions alleging that respondent Amber N.L.'s two minor children were neglected due to an injurious environment. At the adjudicatory hearing,

respondent stipulated to the allegations in the petitions and waived any presentation of their factual basis. The trial court subsequently found that the minors were neglected as alleged in the petitions and made both children wards of the court. Respondent appeals from that determination. We affirm.

¶ 3                                              I. BACKGROUND

¶ 4        On August 5, 2020, an investigator from the Illinois Department of Children and Family Services (DCFS) visited respondent's house after DCFS received a hotline call reporting that the residence was filthy. Initially, respondent refused to allow the investigator to enter the house or to see respondent's two minor children, 15-year-old J.D., who was autistic, and 3-year-old M.L. After the investigator indicated the police would be called, respondent permitted the investigator to enter.

¶ 5        Once inside, the investigator noted that the residence was not unduly dirty but concluded that further investigation was necessary as part of a safety assessment after the investigator became concerned about respondent's behavior. The investigator believed her "bizarre" behavior could have been due to underlying mental health issues or the use of illicit drugs. The safety assessment was not completed, however, due to respondent's lack of cooperation. Although she signed a release permitting her psychiatrist to discuss her mental health with DCFS, she declined to answer any of the investigator's questions about the matter. She also refused to undergo a drug screening at that time, asserting that she did not have any substance abuse issues. She also informed the investigator that she intended to move to Florida with the children on August 27, 2020.

¶ 6        Concerned by respondent's apparent mental health problems and her refusal to cooperate in efforts to assess possible risks to the children, the investigator continued to probe and learned

2

of other ongoing issues, including pending forgery charges filed against respondent. The investigator formulated and implemented a safety plan for the minors, which was to be monitored every five days and which was to include drug drops for the respondent. A DCFS caseworker visited respondent's home five times in August 2020, but each time respondent refused to comply with the requested drug drops.

¶ 7 Respondent was scheduled to attend a court hearing on the pending forgery charges on August 27, 2020. However, around August 28, 2020, the children's maternal grandmother told DCFS that respondent had rented a hotel room in Peoria where she intended to take the children, in violation of the ongoing safety plan. The grandmother also reported that respondent had invited two men over on the two previous nights and each time had demanded that J.D. leave his room so the men could smoke marijuana there. She also claimed that respondent personally smoked marijuana in the living room with the children present. The investigator was also given over 100 unused lottery tickets that had been in respondent's possession. The tickets were allegedly stolen from the Pekin gas station where respondent had previously worked. When the investigator spoke to the gas station's owner, he stated that items worth over $5000 had gone missing. After leaving the gas station, the investigator turned the lottery tickets over to police.

¶ 8 During the investigator's visit with the children's pediatrician, the physician stated that respondent had difficulty relaying the children's history, could not identify J.D.'s medications, and had previously given J.D. the wrong dosages of medication. The physician also noted that M.L. suffered from developmental delays that respondent could have prevented if the girl had attended needed early childhood follow-up visits.

¶ 9 During the investigator's return visit, the children's maternal grandmother related a conversation between respondent and her psychiatrist that she had overhead over a

3

speakerphone. In that conversation, respondent reported having dreams and thoughts of killing her mother, children, and other family members. The grandmother added that she was also aware of respondent's disturbing thoughts because she had personally spoken to respondent's psychiatrist. After the grandmother expressed fear for her own safety and for that of the children, the investigator informed respondent that she had to leave the home. Although she had initially refused to sign the safety plan, respondent then agreed to sign it, telling the investigator she had no place else to go. She also asked the investigator to take her to Unity Point Methodist Hospital, where she intended to voluntarily admit herself to the psychiatric ward. While enroute to the hospital, respondent called her psychiatrist and reported having thoughts about harming her siblings. Once she arrived at the hospital, respondent was admitted to the psychiatric ward.

¶ 10        Fifteen-year-old J.D. told the investigator that he wanted to live with his grandmother because respondent screamed at him and his three-year-old sister. Respondent had also told the girl that she was a "demon" and a "bitch." J.D. added that that his mother smoked "stinky stuff" and hit him in the back. He told the investigator that "I don't wanna stay with her, please, ***, my mom is so trouble [*sic*], she needs to stay gone forever." When the investigator spoke to staff at Unity Point Methodist Hospital the next day, they reported that respondent had been admitted to the psychiatric ward after expressing thoughts of wanting to harm her siblings, nieces, and nephews.

¶ 11        Court records revealed that respondent had also been the subject of two prior cases filed in 2014 and 2017 pursuant to the Juvenile Court Act of 1987 (Juvenile Act) (705 ILCS 405/1-1 *et seq.* (West 2020)). DCFS records showed that she had a long history of indicated reports, including a 2014 indicated report for "Substantial Risk of Sexual Abuse, Sex Offender has Access" and a 2017 indicated report for "Substantial Risk of Physical Injury/Environment

4

Injurious to Health and Welfare by Neglect." She was also indicated by DCFS for medical neglect of M.L. in 2019.

¶ 12    Based on that evidence, DCFS filed two shelter care petitions in Tazewell County on September 15, 2020, seeking adjudication of wardship for J.D. and M.L. based on neglect due to an injurious environment. In her November 2020, answers to those petitions, respondent denied all of the allegations. When the State modified the allegations and filed amended petitions, respondent's new answers stipulated to most of the allegations. An adjudicatory hearing on those petitions was held several months later, in July 2021.

¶ 13    At that hearing, respondent's counsel informed the court that she was not present because she was once again hospitalized in the psychiatric ward at Unity Point Methodist Hospital. Counsel explained that he had previously contacted respondent at the hospital about the pending shelter care petitions and obtained her agreement to stipulate to the allegations, subject to a few modifications. To obtain respondent's stipulation, the State agreed to strike statements made by the grandmother that respondent had contested and to file amended petitions. Both parties waived the presentation of any supporting factual basis for the amended petitions at the hearing.

¶ 14    Near the end of the adjudicatory hearing, testimony was given stating that respondent had readmitted herself to the psychiatric ward for suicidal ideations purportedly caused by losing contact with her son, J.D. She had not seen J.D. in over a year, largely due to his refusal to visit, and she had not seen M.L. for a few months, due, at least in part, to respondent's repeated hospitalizations. The trial judge subsequently entered adjudicatory orders granting the State's amended shelter petitions and finding the minors neglected in that they resided in an injurious environment. A dispositional hearing was set for August 2021.

¶ 15    Prior to the start of that hearing, the trial court received the dispositional hearing report containing the following information. Respondent indicated she had moved to a new home in Peoria, but she was unable to provide a new address, leaving her current housing status unclear. She also stated that she was employed, but she could not provide any paystubs. She had, however, successfully completed parenting classes and had attended 12 of 20 scheduled counseling sessions, missing her most recent sessions due to her hospitalization. Respondent's counselor reported that she was cooperative and engaged during their sessions. Despite being subject to one random drug drop per month under the safety plan, she had not appeared for 8 out of 12 tests. Of the four drops she performed, she tested positive for THC twice and positive for barbiturates once. Despite having weekly scheduled visits with her children, respondent had attended just eight visits with M.L., cancelled six visits because she was hospitalized or ill, and missed five others without providing any reason. Although J.D. had initially declined to see respondent, he had engaged in two visits with her since July 2021.

¶ 16    During the dispositional hearing, respondent's counsel elicited testimony from her caseworker about his difficulty in providing respondent with bus passes because she had not updated her address, but he stated that problem had been resolved. The State made a recommendation that the minors be found to be neglected and be made wards of the court, with DCFS named as their guardian with the right of placement. It also asserted that respondent should be found unfit for the reasons stated in the amended petitions and requested that she be provided with appropriate services.

¶ 17    Counsel for respondent argued at the dispositional hearing that she had successfully completed parenting classes, was undergoing counseling, had provided drug drops when she was able, had tried to visit her children regularly, and was frustrated about not being able to receive

bus passes. Her counsel maintained that "we're on the brink of fitness at this point." The minors' guardian *ad litem* (GAL) noted that J.D. was autistic and described his willingness to restart visits with respondent as a positive change. Despite this progress, however, the GAL agreed with the State that respondent was an unfit parent.

¶ 18    After the hearing, the trial judge entered dispositional orders granting the State's requests for wardship and appointing DCFS as the children's guardian. It also found that respondent was an unfit parent. She filed timely notices of appeal, and the minors' cases were consolidated.

¶ 19                                II. ANALYSIS

¶ 20    As stated by respondent in her brief, the sole issue in this appeal is whether the trial court erred in finding that the minors, J.D., and M.L., were neglected due to an injurious environment. Although an "injurious environment" "cannot be 'defined with particularity,' *** it includes the breach of a parent's duty to ensure a safe and nurturing shelter for his or her children." *In re Z.L.*, 2021 IL 126931, ¶ 89 (quoting *In re Arthur H.*, 212 Ill. 2d 441, 463 (2004)). When reviewing that question, the court must consider each case on its own facts, and a reviewing court "will not disturb the trial court's finding of abuse or neglect unless it is against the manifest weight of the evidence." *Id.* ¶ 61. A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if it is unreasonable or arbitrary, or not rooted in the evidence. *In re D.F.*, 201 Ill. 2d 476, 498 (2002). Accordingly, we may reverse the trial court's neglect findings only if the State did not prove the neglect allegations in the shelter petitions by a preponderance of the evidence. *In re Z.L.*, 2021 IL 126931, ¶ 61. To satisfy that burden, the State must show that the allegations were more probably true than not. *Id.*

¶ 21    On appeal, respondent first contends that the DCFS investigator's initial visit to respondent's home was violative of the fourth amendment of the United States Constitution. She

7

asserts that because the visit was premised on an anonymous hotline call reporting a filthy dwelling, once the premises were determined not to be filthy, the investigation turned into an unreasonable search that was not supported by probable cause. See U.S. Const., amend. IV.

¶ 22    While it is true that the investigator determined that respondent's home was not filthy after she finally gained entry, her continuing investigation was warranted by the investigator's developing safety concerns due to respondent's behavior, which the investigator described as "bizarre." As one of DCFS's field personnel, the investigator was a mandatory reporter of child abuse or neglect that puts minors at risk. 89 Ill. Adm. Code 300.30(B)(1)(bb) (2020). The investigator's personal observation of disturbing behavior by respondent, including her refusal to discuss her mental health issues or complete a drug screen, and her assertion that she was taking the children to live in Florida in a few weeks, was sufficient to support the continuation of the investigation into possible neglect or abuse of the two minors under her care.

¶ 23    Respondent also claims that the investigator's statement that she would call the police if she were not allowed to enter the home was unconstitutional because consent may not be coerced by either implicit or explicit means. See *Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973). The regulations applicable to DCFS investigations related to risks to minors' health and safety guide our review of this claim. When conducting an initial DCFS assessment, an investigator is mandated to fulfill numerous duties, including a duty to evaluate the minors' health and safety before deciding whether they can safely remain in the residence. 89 Ill. Adm. Code 315.100(a). The same regulation requires investigators to identify the risk of harm the minors face. *Id.*

¶ 24    Here, the impetus for the investigator's initial visit was a hotline report that the minors were living in filthy conditions. Respondent's claim that the investigation was illegal because the investigator did not find the home to be filthy misses the point. When respondent barred the

8

investigator from entering her home, she effectively precluded an assessment of the home's condition or the safety risk it presented to the minors living there. Accordingly, respondent interfered with the investigator's ability to fulfill the mandatory duties imposed on DCFS after receipt of a call relating to the safety of minors. Without the ability to investigate properly, the potential risk to the minors' health and safety could be perpetuated indefinitely.

¶ 25    DCFS is charged with "protect[ing] the health, safety, and best interests of the child in all situations in which the child is vulnerable to child abuse or neglect." 325 ILCS 5/2 (West 2020). Section 2(a) of the Abused and Neglected Child Reporting Act mandates that DCFS "shall, upon receiving reports made under this Act, protect the health, safety, and best interests of the child in all situations in which the child is vulnerable to child abuse or neglect, offer protective services in order to prevent any further harm to the child and to other children in the same environment or family, stabilize the home environment, and preserve family life whenever possible." 325 ILCS 5/2(a) (West 2020). Those duties are broad and not limited to protecting vulnerable children from the specific danger that originally prompted the investigation.

¶ 26    Although it is true that the investigator ultimately concluded the home was not filthy, that conclusion could only be reached after the investigator was able to gain access to the home. Respondent's argument in this court, however, is premised on the alleged impropriety of the investigator's conduct before she was even allowed to enter the home. At that point, respondent's refusal to cooperate with the investigation barred DCFS from fulfilling its mandatory duty to determine whether the minors residing there were at risk.

¶ 27    Respondent adds that the investigator's reference to calling the police unless she was allowed into the home was so coercive as to obviate respondent's eventual grant of consent. We disagree. The investigator's bare statement, standing alone, was not inherently coercive under the

facts of this case. Respondent's conduct obstructed the investigator's performance of her mandated duties to ensure the safety and well-being of the minors living under respondent's care. Even if the police had been called to respondent's home, their subsequent actions are purely speculative. If they came to the residence at all, they might simply have mediated the conflict between respondent and the investigator. Without more, the mere statement of a future intent to call the police is just that, a statement of intent. How respondent chose to respond to that statement was entirely up to her. Although in this case respondent chose to avoid any potential police involvement by allowing the investigator into her resident, she could just as easily have maintained her initial refusal. The investigator's stated intent did not, by itself, unconstitutionally coerce respondent into taking any particular action.

¶ 28     Once the investigator was inside the home, she was able to evaluate its condition, concluding that the home was not dirty enough to affect the minors' safety or health. Satisfied that the original basis for the investigation was incorrect, but troubled by her observations of respondent's behavior, the investigator decided to continue the visit. The investigator described respondent's behavior as "bizarre" and explained that it was suggestive of a mental illness or the use of an illicit drug that could impair respondent's decision-making ability. When the investigator attempted to address those concerns with respondent, she refused to discuss her mental health status or to take the requested drug test. Those refusals again implicated the investigator's statutory duties. Moreover, respondent's revelation that she intended to move to Florida with the children a few weeks later raised additional concerns with the investigator.

¶ 29     The applicable regulations mandate that DCFS's initial investigation must include "in-person contact with all alleged child victims or in-person examination of the environment for inadequate shelter and environmental neglect reports" such as this one. 89 Ill. Adm. Code

10

300.100(b)(1). If a caregiver presents an imminent danger to a minor's safety or health, perhaps due to the effects of a serious mental illness or illegal drug usage, the investigator is authorized to take any impacted children into protective custody. 89 Ill. Adm. Code 300.100(a). If respondent followed through on her intent to remove the children to Florida, DCFS would lose the ability to protect the minors from risks to their health and safety, making a prompt investigation into those risks critical. Under those circumstances, the investigator's continued presence at respondent's home was justified based on the investigator's personal observations as well as her duties under the applicable regulations.

¶ 30        Respondent next contends that both evidence of the forgery charges pending against her and evidence appearing to link her to the theft of at least 100 lottery tickets from her former employer violated her presumption of innocence and were unduly prejudicial. Those arguments are inapt.

¶ 31        The presumption of innocence is a principle applicable in the context of criminal proceedings. *Riesen v. Riesen*, 148 Ill. App. 460, 464 (1909). Indeed, the only two cases respondent cited for the proposition that she is entitled to the presumption of innocence until proven guilty beyond a reasonable doubt are both criminal matters, *People v. Weinstein*, 35 Ill. 2d 467, 469-70 (1966), and *People v. Magnafichi*, 9 Ill. 2d 169, 173 (1956). Her argument ignores the fact that a shelter case proceeding is civil, not criminal, in nature, and that the applicable burden of proof is the preponderance of the evidence, not proof beyond a reasonable doubt. See *In re Z.L.*, 2021 IL 126931, ¶ 61 (stating the preponderance of the evidence standard in similar civil proceedings). The principle of the presumption of innocence is irrelevant here.

¶ 32        Respondent also does not dispute that she was facing criminal forgery charges when DCFS began its investigation. If respondent were convicted, it would adversely impact the

11

children by leaving them without either a parent or any adult supervision in the home. The risk to the children was even greater due to the evidence implicating respondent in the theft of the lottery tickets from her employer. Any charges arising out of that evidence would undoubtedly increase the risk faced by the children because a conviction could result in respondent being away from home even longer. DCFS cannot reasonably be expected to ignore those factors when making and implementing a safety plan. Uncertainty about respondent's condition and the potential risk to the children were heightened by respondent's assertion that she was moving to Florida on the day of her next scheduled court date on the forgery charges, suggesting that she could face even more charges if she attempted to evade prosecution.

¶ 33        Viewed in context, the evidence related to respondent's pending and potential criminal cases was relevant and not unduly prejudicial in the trial court's assessment of whether the minors were at-risk or neglected due to an injurious environment. The best interests of children always lie in anticipating and preventing harm to them rather than in attempting to repair any harm after it has occurred. See 325 ILCS 5/2(a) (West 2020) (stating DCFS "shall, upon receiving reports made under this Act, *** offer protective services in order to prevent any further harm to the child and to other children in the same environment or family, stabilize the home environment, and preserve family life whenever possible").

¶ 34        Next, respondent refutes the argument that the children were neglected by pointing to the investigator's implementation of a safety plan during her initial visit. Contrary to respondent's claim that she cooperated with the safety plan, the evidence shows that she committed repeated violations by failing to perform most of the required drug drops and submitting tests that resulted in positive results three out of the other four drops.

12

¶ 35        While respondent maintains that she should not have been asked to leave her home, the evidence shows that she was suffering from mental health issues and experiencing and voicing homicidal thoughts about harming her siblings, nieces, and nephews. Those circumstances provided a reasonable basis for removing the children from her care. Evidence of a caregiver's anger and aggression toward other people may be admitted to assess allegations of an injurious environment, even if those outbursts occurred outside the presence of the children. *In re A.W., Jr.*, 231 Ill. 2d 241, 256 (2008).

¶ 36        The evidence also refutes respondent's claim that she admitted herself to the psychiatric ward only because she had nowhere else to go. As the investigator was taking her to the hospital, respondent contacted her psychiatrist and personally informed him that she was having thoughts about hurting adult family members. Once she was voluntarily admitted, respondent was kept at the hospital for care. Because respondent stipulated to the factual basis in the shelter petition, she cannot now argue that those statements were false.

¶ 37        Although a parent's struggles with mental health issues, standing alone, do not establish neglect due to an injurious environment, the State offered substantially more evidence in support of that finding. During the investigator's first meeting with respondent, her behavior was found to be sufficiently unusual as to raise significant concerns. Her fifteen-year-old son J.D. subsequently told officials that she screamed at both children, told three-year-old M.L. that she was a "demon" and a "bitch," and hit J.D., leading him to tell authorities that respondent needed "to stay gone forever." In addition, the children's pediatrician relayed that respondent was a "difficult" historian, was unaware of J.D.'s medications, and had given him incorrect doses of medication in the past. He also indicated that M.L.'s developmental delays could have been averted if she had attended appropriate early childhood follow-up visits.

13

¶ 38    Respondent attempts to minimize the impact of that evidence by arguing that J.D.'s autism and the lack of specific detail in the statements of both J.D. and the children's pediatrician undermined the probative value of their statements. We remain unpersuaded, however, because those assertions overlook respondent's decision to adopt the State's evidence by stipulating to it rather than attempting to test or refute it. Accordingly, our review of the trial court's ruling will consider those statements.

¶ 39    Additional evidence adduced by the State reveals that respondent had a lengthy history with DCFS, including Juvenile Act cases filed against her in both 2014 and 2017. She was also the subject of three indicated reports implicating the neglect of her children: a 2014 indicated report for "Substantial Risk of Sexual Abuse, Sex Offender has Access," a 2017 indicated report for "Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare by Neglect," and a 2019 indicated report for medical neglect of M.L. Those reports are admissible in an adjudicatory hearing pursuant to section 2-18(4)(b) of the Juvenile Act. 705 ILCS 405/2-18(4)(b) (West 2020). Although indicated reports are not *prima facie* evidence of abuse or neglect, they establish that an investigation was conducted that resulted in a determination that credible evidence supported the allegations of abuse or neglect. *Slater v. The Department of Children & Family Services*, 2011 IL App (1st) 102914, ¶ 23 (citing 325 ILCS 5/3 (West 2004)). Accordingly, we also incorporate that evidence into our review.

¶ 40    To prove the claims in the shelter care petitions in the trial court, the State had to satisfy its burden of establishing by a preponderance of the evidence that respondent's children were neglected. Proving a fact by a preponderance of the evidence requires a showing that the allegations made were more likely to be true than untrue. *In re Z.L.*, 2021 IL 126931, ¶ 61. On appeal, we must uphold the trial court's findings unless they are against the manifest weight of

14

the evidence. *Id.* For findings to be contrary to the manifest weight of the evidence, the opposite conclusion must be clearly evident, or the ruling must be unreasonable or arbitrary or not based on the evidence. *In re D.F.*, 201 Ill. 2d at 498. After carefully viewing the evidence in its totality, we cannot say that the trial court's findings that respondent's children were neglected were against the manifest weight of the evidence.

¶ 41                                      III. CONCLUSION

¶ 42         For the reasons stated, we affirm the findings that J.D. and M.L. were neglected based on the presence of an injurious environment. Accordingly, the judgment of the circuit court of Tazewell County is affirmed.

¶ 43         Affirmed.