NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 240466-U

NO 4-24-0466

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 2, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* M.L., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Tazwell County |
|     Plaintiff-Appellee, | ) | No. 20JA260 |
|     v. | ) | |
| Amber L., | ) | Honorable |
|     Respondent-Appellant). | ) | Timothy J. Cusack, |
| | ) | Judge Presiding. |

JUSTICE VANCIL delivered the judgment of the court.
Justices Harris and Zenoff concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court granted appellate counsel's motion to withdraw and affirmed, concluding no issue of arguable merit could be raised on appeal.

¶ 2    In May 2023, the State filed a petition to terminate the parental rights of respondent, Amber L., as to her minor child, M.L. (born in 2017). In March 2024, the trial court terminated respondent's parental rights and changed the permanency goal to adoption. M.L.'s father is not a party to this appeal.

¶ 3    Respondent appealed. This court appointed counsel to represent respondent. Counsel filed a motion to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967), arguing respondent's appeal presents no potentially meritorious issues for review. This court gave respondent the opportunity to respond to the motion, and respondent filed a response. We grant the motion to withdraw and affirm the trial court's judgment.

¶ 4                        I. BACKGROUND

¶ 5        In September 2020, the State filed a petition to adjudicate M.L. neglected under the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.* (West 2020)), alleging M.L. was in an environment injurious to her welfare (705 ILCS 405/2-3(1)(b) (West 2020)). In July 2021, the State filed an amended petition generally alleging, (1) in response to an environmental neglect call, an investigator for the Illinois Department of Children and Family Services (DCFS) reported respondent engaged in "bizarre" behavior, leading to a safety plan being put in place, during which respondent did not comply with the plan, (2) respondent later expressed thoughts of harming her family and, after initially refusing to comply with the safety plan, allowed herself to be committed for psychiatric treatment, and (3) respondent had a lengthy history of indicated reports with DCFS. The petition at times referred to M.L.'s older sibling, J.D. Allegations concerning J.D. are not at issue in this appeal. Respondent generally stipulated to the allegations.

¶ 6        In July and August 2021, the trial court adjudicated M.L. neglected, found respondent unfit, made M.L. a ward of the court, and placed guardianship and custody with DCFS. The court ordered respondent to complete multiple tasks to correct the conditions leading to the adjudication and removal of M.L. Respondent appealed. The record shows the appellate court initially dismissed the appeal for failure to timely file a brief. However, on March 9, 2023, the appellate court, in relevant part, affirmed the trial court's determination M.L. was neglected, finding the determination was not against the manifest weight of the evidence. *In re M.L. and J.D.*, 2023 IL App (3d) 210375-U.

¶ 7        In May 2023, the State filed a petition for termination of parental rights, alleging respondent was unfit under section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(i), (ii) (West 2022)) for failing to make reasonable progress toward the return of M.L. to her care within

nine months after the adjudication of neglect. The State alleged a nine-month period of August 12, 2022, to May 12, 2023.

¶ 8    In December 2023, the trial court conducted a fitness hearing. Jacob Razo testified he was the caseworker on the matter from March 11, 2022, to February 1, 2023. Regarding services required of respondent, Razo testified respondent lived at "the Dream Center in Peoria," which the record reflects was a homeless shelter, and did not have her own residence. Respondent had inconsistent communication and "mixed cooperation" with Razo due to missed home visits. Respondent had missed some drug drops and tested positive for tetrahydrocannabinol (THC) in the drops she completed. However, respondent had completed a drug assessment without treatment being recommended. She also completed a psychological evaluation and was engaged in counseling.

¶ 9    Razo testified respondent's visits with M.L. were suspended before the nine-month period at issue because M.L. experienced negative reactions after visits, such as nightmares and skin picking. M.L.'s behaviors improved after visits with respondent stopped, and visits had not resumed during the time-period at issue. Razo never had a specific conversation with respondent about returning M.L. to her care. He believed a return home was possible but not likely. Razo further testified respondent was employed. Overall, he believed respondent made reasonable progress at times but did not apply what she learned in services to her actions and communications.

¶ 10    LaDonna Boken-Buckley testified she was the caseworker from February 1, 2023, to the date of the hearing. Boken-Buckley stated she did not think it was appropriate to restart visits between respondent and M.L. during that time. Respondent continued to reside at the Dream Center, which was not an appropriate home for a child. M.L. had also done better after the visits stopped. Meanwhile, respondent was not fully cooperating in addressing issues with her own

mental health. Respondent continued to miss drug drops and test positive for THC without showing a valid prescription. There were also issues with communication and, on one occasion when Boken-Buckley asked respondent to provide a work schedule to corroborate the reason for missed drug drops, respondent became demanding, yelled and cursed, and was disrespectful, causing Boken-Buckley to end the call.

¶ 11 Boken-Buckley testified respondent violated a no-contact order regarding J.D. At the beginning of May 2023, respondent also would not sign releases for Boken-Buckley to receive information from her doctor but said she would obtain her own letter from the doctor. Overall, respondent was unable to make any demonstrable steps towards returning M.L. to her care, and Boken-Buckley rated respondent as having unsatisfactory progress on her service plan.

¶ 12 On cross-examination Boken-Buckley testified respondent engaged in counseling but did not take accountability for her mental health when it came to stating she wanted to hurt her family. The record indicates Boken-Buckley had also been informed respondent inappropriately claimed M.L. as a dependent on her tax return.

¶ 13 Respondent testified she had a medical marijuana card prescribed by her rheumatologist for fibromyalgia pain. She testified she informed her caseworker about the prescription. Respondent stated she was seeing her psychiatrist and using her paychecks while living at the Dream Center to pay off debts to improve her credit score so she could obtain housing.

¶ 14 Respondent testified she believed family counseling was recommended, but she was told she could not attend due to the no-contact order. However, she sought out family counseling on her own. Respondent was also recovering from a bus accident, which resulted in a severe concussion, torn ligaments, and required three months of physical therapy. Respondent sought additional counseling for trauma and nightmares related to the accident and was prescribed

oxycodone for pain. She informed her caseworker about the medication and took it as directed. Respondent denied claiming M.L. as a dependent on her tax return. Respondent admitted she had contact with her son, J.D., in violation of a court order, but she stated it was initiated by him. She also was ordered not to have contact with M.L., but she did not believe M.L.'s behavior should be attributed to her and stated her psychiatrist believed "DCFS tears families apart." Respondent testified she had provided releases for her doctors to her caseworker. She also discussed her progress in therapy, including learning to manage stress and improve communication. Respondent provided letters written on her behalf from her psychologist, her supervisor at her employment, and a person associated with the Dream Center.

¶ 15    The State and the guardian *ad litem* asked the trial court to find respondent unfit. The court found respondent failed to make reasonable progress toward the return of M.L. to her care during the nine-month period at issue. The court discussed the evidence at length, noting in particular respondent made some progress but consistently remained unfit, with the latest service plan rated unsatisfactory. The court noted respondent had no stable housing, missed drug drops, was unable to resume visits with M.L., and violated a no-contact order. Ultimately, the court found there was no progress toward the return of M.L. to respondent's care and found respondent unfit.

¶ 16    On March 8, 2024, the trial court accepted a best interest report prepared by Boken-Buckley. The report noted M.L. had been in her current foster placement since October 2020. The foster parents met M.L.'s basic needs of safety and welfare including food, shelter, clothing, health, and education. M.L. had an Individualized Education Program (IEP) for developmental delays and speech. M.L. had a bond with her foster parents, who were willing and able to adopt her. The report further noted respondent had not completed services, and M.L. needed permanency. Accordingly, Boken-Buckley recommended the court terminate parental rights and

change the permanency goal to adoption. Boken-Buckley testified consistently with her report. She added M.L. had her own room at the foster home, a television, and many toys. M.L. referred to her foster parents as "[m]om and dad." She looked to them for comfort and considered three other foster children in the home to be her siblings.

¶ 17　　　　M.L.'s foster mother testified about M.L.'s care and IEP. She also testified M.L. had anxiety that was diagnosed when she began having problems following visits with respondent. M.L. also had seizures triggered by stress. M.L.'s anxiety improved when visits with respondent stopped, and she had not had a seizure since September 2022.

¶ 18　　　　Tammy Burtch, respondent's counselor, testified as to improvements she had seen in respondent and disputed some of the previous allegations concerning respondent's mental health. Several additional witnesses testified on behalf of respondent, including her former employment supervisor, an employee of the Dream Center, and her sister.

¶ 19　　　　Respondent testified she was not told why her visits with M.L. were stopped and, when she asked if she could continue visits, Razo told her she had to wait until her next court hearing. She stated she was not provided with family counseling as ordered by a previous judge. Respondent testified she had received a settlement related to her bus accident and had bought a home, but it was under renovation and was not yet suitable for children. However, she said it would be completed by June and suggested M.L. could stay at her sister's house before that. However, respondent had previously stated her sister's house would be "too tight" for them. Respondent also made various claims about providing her work schedule to her caseworker that contradicted earlier statements. Respondent had quit her job because she did not have transportation. She stated she quit using THC in September 2023. However, she tested positive for THC in December 2023.

Respondent was unable to state the name of M.L.'s teacher, neurologist, or primary care physician. She stated she was not allowed to know the names of the medical providers.

¶ 20        The trial court found it was in M.L.'s best interest to terminate respondent's parental rights. The court noted it considered the statutory factors. The court found M.L. had spent almost half of her life in foster care and required permanence. While the court credited respondent for attempting to make progress, the court noted she still could not provide adequate food, shelter and safety for M.L., especially in light of M.L.'s special needs. Further, M.L. was bonded with her foster family, who took care of her needs, and she had made enormous strides in their care. Accordingly, the court terminated respondent's parental rights and changed the permanency goal to adoption.

¶ 21        This appeal followed.

¶ 22                                II. ANALYSIS

¶ 23        Respondent's appellate counsel moves to withdraw. Counsel supports her motion with a memorandum of law providing a statement of facts, a discussion of potential claims, and arguments why those issues lack arguable merit. Notice of counsel's request to withdraw was sent to respondent's last known address. This court advised respondent she had until May 28, 2024, to respond to the motion. Respondent filed a response on May 28, 2024. The State indicated it would not file a brief in this case.

¶ 24        Counsel first submits it would be frivolous to argue the trial court erred in finding respondent unfit. We agree.

¶ 25        Under section 2-29(2) of the Juvenile Court Act (705 ILCS 405/2-29(2) (West 2022)), the involuntary termination of parental rights is a two-step process. First, the State must prove by clear and convincing evidence the parent is "unfit," as defined in section 1(D) of the

Adoption Act (750 ILCS 50/1(D) (West 2022)). *In re Donald A.G.*, 221 Ill. 2d 234, 244, 850 N.E.2d 172, 177 (2006). If the State proves unfitness, it then must prove by a preponderance of the evidence that termination of parental rights is in the best interest of the child. *In re D.T.*, 212 Ill. 2d 347, 363-66, 818 N.E.2d 1214, 1226-28 (2004).

¶ 26 A determination of parental unfitness involves factual findings and credibility determinations the trial court is in the best position to make because "the trial court's opportunity to view and evaluate the parties *** is superior." (Internal quotation marks omitted.) *In re M.I.*, 2016 IL 120232, ¶ 21, 77 N.E.3d 69. A trial court's finding of parental unfitness will not be reversed unless it is against the manifest weight of the evidence. *In re N.G.*, 2018 IL 121939, ¶ 29, 115 N.E.3d 102. A decision is against the manifest weight of the evidence only when the opposite conclusion is clearly apparent. *N.G.*, 2018 IL 121939, ¶ 29.

¶ 27 Under section 1(D)(m)(ii) of the Adoption Act, a parent may be found unfit for failing "to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor." 750 ILCS 50/1(D)(m)(ii) (West 2022). "Reasonable progress" has been defined as "demonstrable movement toward the goal of reunification." (Internal quotation marks omitted.) *In re Reiny S.*, 374 Ill. App. 3d 1036, 1046, 871 N.E.2d 835, 844 (2007). Reasonable progress exists when the trial court

> "can conclude that *** the court, in the *near future*, will be able to order the child returned to parental custody. The court will be able to order the child returned to parental custody in the *near future* because, at that point, the parent *will have fully complied* with the directives previously given to the parent in order to regain custody of the child." (Emphases in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461, 577 N.E.2d 1375, 1387 (1991).

¶ 28 We have emphasized " 'reasonable progress' is an 'objective standard.' " *In re F.P.*, 2014 IL App (4th) 140360, ¶ 88, 19 N.E.3d 227 (quoting *L.L.S.*, 218 Ill. App. 3d at 461). A trial court may only consider evidence from the relevant time period in determining a parent's fitness based on reasonable progress. *Reiny S.*, 374 Ill. App. 3d at 1046 (citing *In re D.F.*, 208 Ill. 2d 223, 237-38, 802 N.E.2d 800, 809 (2003)).

¶ 29 Here, the trial court found respondent failed to make reasonable progress toward the return of M.L. to her care during the nine-month period at issue. The court discussed the evidence presented at length, noting in particular respondent had made some progress but consistently remained unfit, with the latest service plan rated unsatisfactory. As the court noted, respondent had no stable housing, missed drug drops, was unable to resume visits with M.L., and violated a no-contact order. Thus, it was clear the court could not conclude it would, in the near future, be able to order M.L. returned to respondent's custody. Thus, the court's determination respondent was unfit was not against the manifest weight of the evidence.

¶ 30 Counsel next submits it would be frivolous to argue it was not in M.L.'s best interest to terminate respondent's parental rights.

¶ 31 When a trial court finds a parent unfit, "the court then determines whether it is in the best interests of the minor that parental rights be terminated." *D.T.*, 212 Ill. 2d at 352. "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *D.T.*, 212 Ill. 2d at 364. The State must prove by a preponderance of the evidence termination of parental rights is in the minor's best interest. *D.T.*, 212 Ill. 2d at 366. In making the best interest determination, the court must consider the factors set forth in section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2022)). These factors include:

"(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties, including familial, cultural, and religious; (4) the child's sense of attachments, including love, security, familiarity, and continuity of affection, and the least-disruptive placement alternative; (5) the child's wishes; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parental figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the persons available to care for the child." *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071, 918 N.E.2d 284, 291 (2009) (citing 705 ILCS 405/1-3(4.05) (West 2008)).

"The court's best interest determination [need not] contain an explicit reference to each of these factors, and a reviewing court need not rely on any basis used by the trial court below in affirming its decision." *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19, 8 N.E.3d 1258. On review, "[w]e will not disturb a court's finding that termination is in the [child's] best interest unless it was against the manifest weight of the evidence." *In re T.A.*, 359 Ill. App. 3d 953, 961, 835 N.E.2d 908, 914 (2005).

¶ 32    Here, the evidence demonstrated M.L. had a strong bond with her foster family. The foster parents provided for M.L.'s needs, including food, clothing, shelter, and medical care. The foster parents wanted to provide permanency for M.L. While respondent had made efforts to correct the circumstances that led to M.L.'s removal, as the trial court noted, she still was not able to provide adequate food, shelter, and safety for M.L., especially in light of M.L.'s special needs. Indeed, visits with M.L. had never resumed, and the evidence showed previous visits caused

anxiety for M.L. The court considered the evidence in relation to the statutory best interest factors and found they weighed in favor of terminating respondent's parental rights. We cannot conclude the evidence in the record "clearly calls for the opposite finding" or is such that "no reasonable person" could find as the court found. (Internal quotation marks omitted.) *In re J.H.*, 2020 IL App (4th) 200150, ¶ 68, 162 N.E.3d 454. Accordingly, the court's best interest determination was not against the manifest weight of the evidence.

¶ 33　　　　After examining the record, the motion to withdraw, the memorandum of law, and respondent's response, we agree with counsel that this appeal presents no issue of arguable merit. Accordingly, we grant the motion to withdraw as appellate counsel and affirm the trial court's judgment.

¶ 34　　　　　　　　　　　　III. CONCLUSION

¶ 35　　　　For the reasons stated, we grant appellate counsel's motion to withdraw and affirm the trial court's judgment.

¶ 36　　　　Affirmed.