NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 240608-U

NO. 4-24-0608

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 23, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* M.R., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Peoria County |
|     Petitioner-Appellee, | ) | No. 23JA219 |
|     v. | ) | |
| Marteeka R., | ) | Honorable |
|     Respondent-Appellant). | ) | David A. Brown, |
| | ) | Judge Presiding. |

---

JUSTICE HARRIS delivered the judgment of the court.
Justices Lannerd and Knecht concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court's findings in its dispositional order were not against the manifest weight of the evidence.

¶ 2    Respondent, Marteeka R., appeals the trial court's dispositional order finding her unfit to care for her minor child, M.R. (born in December 2012), making M.R. a ward of the court, and placing custody and guardianship of M.R. with the Illinois Department of Children and Family Services (DCFS). We affirm.

¶ 3                                  I. BACKGROUND

¶ 4    In October 2023, the State filed a petition alleging M.R. was a neglected minor because her environment was injurious to her welfare. Specifically, it alleged (1) M.R. had been prescribed medication for a mental health disorder that resulted in disruptive behaviors and physical aggression and respondent "ha[d] not made that medication available for [M.R.] to take

while at school"; (2) in cases that were closed in August 2023 (Peoria County case Nos. 20-JA-163 to 20-JA-165), M.R. and her siblings were made wards of the court based on allegations that respondent picked M.R. up late from school and daycare on several occasions and did not provide a proper care plan for her; (3) M.R. reported being "the subject of physical violence" perpetrated by respondent, that respondent was "drunk and/or high all the time," and that M.R. did not feel safe in the home; (4) M.R. reported that respondent kept marijuana "on the counter in the home" where M.R. could access it; (5) respondent had been "indicated" in March 2019 "for Cuts, Bruises, Welts, Abrasions, and Oral" and March 2020 for "Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare by Neglect"; and (6) respondent had a conviction in Tazewell County case No. 18-CM-493 for resisting a peace officer.

¶ 5    In November 2023, respondent filed an answer to the State's petition. She admitted the State's allegations regarding the prior juvenile neglect cases that involved M.R. and M.R.'s siblings, the previous "indicated" findings against her, and her criminal history. Respondent denied the remaining allegations against her.

¶ 6    In February 2024, the trial court conducted an adjudicatory hearing. The State presented evidence that in August and October 2023, DCFS investigated allegations of abuse and neglect involving M.R. Rakeitta Netters, a DCFS investigator, testified that the first investigation was prompted by a hotline report on August 16, 2023, that M.R. was not receiving her medication and was suspended from school. Netters went to respondent's home to speak with her about the allegations. When Netters knocked on respondent's door, she "heard a lady from the inside ask who it was." Netters identified herself and stated she was "with DCFS." She then "heard loud music turn on." Netters testified she waited approximately five minutes before contacting her supervisor, who directed her to knock on respondent's door again. Respondent came to the door

after the second knock, and Netters introduced herself and told respondent about the hotline report. According to Netters, respondent "stated that she was not going to cooperate with DCFS, that she ha[d] an attorney, and she wanted to get in contact with her attorney." She also told Netters that M.R. was taking her medication and that she would not send the medication to M.R.'s school because she had plans to move "and did not want to fight the school to get the medication back." Netters testified respondent then "closed the door on [her]."

¶ 7       Netters testified she also spoke with M.R. in connection with the August 2023 investigation, and M.R. stated she was suspended from school for hitting a teacher with a pen or pencil. M.R. confirmed to Netters that she took medication, stating she took two pills, one in the morning and one at night. M.R. explained that she used to take three pills, but respondent "stopped one of the pills" because respondent said M.R. "was aggressive and would not eat." M.R. denied feeling aggressive when she took her medication.

¶ 8       The second DCFS investigation was triggered by a report on October 5, 2023, that M.R. stated respondent "had stomped her." That investigation resulted in DCFS taking protective custody of M.R. Netters testified she spoke to respondent about the allegations by phone and respondent yelled and cursed and was "upset in regards to another report coming in." Respondent also denied the allegations. When Netters explained that DCFS "wanted to do a safety plan," respondent yelled, "saying, [']you're going to do what you want to do, go ahead and do what you want to do.['] " Netters testified respondent hung up the phone, so Netters contacted her via text message and asked for the name of a relative or friend who could care for M.R. "to avoid [DCFS] taking protective custody." In response, respondent asked to speak with Netters's supervisor. Netters characterized respondent as being "generally uncooperative" with the attempts to put a safety plan in place.

¶ 9 During her investigation into the October 2023 allegations, Netters also spoke with M.R. She testified M.R. reported that respondent stomped on her because M.R. was "kicked out of her after-school program." According to M.R., respondent also "whipped her with a black belt" all over her body. Netters observed a scratch mark on M.R.'s arm that "appeared as if it was healing." M.R. indicated the scratch "was from when [respondent] hit her," but Netters could not determine whether the scratch was the result of physical abuse.

¶ 10 Netters testified M.R. further told her that respondent smoked marijuana, was "always high," and "drank Hennessy." M.R. stated she knew that the marijuana "was located on a counter in a plastic bag." Finally, M.R. reported to Netters that she did not feel safe in her home with respondent.

¶ 11 Shelbry Wilson-Brown testified she was employed as a family/school liaison at M.R.'s school. She was familiar with M.R. due to her disruptive behavior at school and provided services that included trying to get M.R to return to class when she refused to go, "coach[ing]" M.R. off "of a ledge in the hallway," and transporting M.R. to her in-school, suspension-type program at another school. Wilson-Brown spoke with respondent about M.R.'s behavior and her medication. Respondent stated she wanted to give the medication to M.R. herself. Wilson-Brown testified she tried to get respondent to sign a consent to allow the school nurse to administer the medication, but respondent refused.

¶ 12 Deanne Tucker-White testified she was the assistant principal at M.R.'s school and M.R.'s "direct line of discipline." She recalled M.R. using "very intense language" at school and incidents when M.R. hit a teacher and other students. Tucker-White noted an incident on September 6, 2023, when M.R. was swinging something that resembled a purse chain. When someone tried to take the item away, M.R. "started using the f-bomb" and the situation escalated.

Tucker-White suspended M.R. from school following the incident. She testified M.R. was not aggressive when it appeared that she was taking her medication three times a day. Tucker-White spoke with respondent about M.R.'s behavior twice, once in person and once on the phone. She described respondent as "very supportive," stating as follows:

> "When [respondent] was [present for the in-person] meeting, we talked about resolving the med issue because that was one of the main issues. [Respondent] wanted [M.R.] to come back to school full time. And at this time, we had put [M.R.] on half days because of the behavior, so [respondent] was very supportive of trying to make that happen."

When Tucker-White met respondent in person, she noticed a "very significant" odor of cannabis on respondent.

¶ 13 Tucker-White testified that since October 2023, M.R. had not had as many disruptive incidents at school. Specifically, M.R. had some recent referrals, but no suspensions. Also, she was aware that at some point, M.R. had started receiving medication administered to her at school at least once a day.

¶ 14 Heather Dawson testified she worked as a special education coordinator at M.R.'s school. M.R. had an individualized education plan (IEP), and Dawson was contacted about M.R. during the first week of school because M.R. "was having a lot of struggles behaviorally." Following an IEP meeting on September 13, 2023, Dawson, as part of M.R.'s IEP team, made the decision to move M.R. to half days at school "because [M.R.'s] behavior was so dis-regulated *** that she was a danger to herself and others." At first, respondent was unaware of that decision because she would not communicate with the IEP team. Specifically, Dawson testified respondent had been informed of the IEP meeting concerning M.R. and, although she stated she would be

present, she did not show up on the day of the meeting. When an attempt was made to call respondent, she hung up the phone, and subsequent calls went "straight to voicemail." Dawson stated she then went to respondent's home. Respondent answered "through the door," but once she was told who was there, she would not open the door and stopped responding.

¶ 15　　　When asked how she could tell if M.R. did not receive her medication, Dawson stated, "[M.R.] will tell you, and you can also tell in her behavior. When she has her medication, she's very calm and able to have conversations. When she's not, there's a lot of cussing, running; there's noncompliance." Dawson noted one instance "a couple weeks before [M.R.'s] IEP meeting," when M.R. "assaulted two of the staff" and had to be carried because she refused to walk. She stated M.R. would also run through the halls, "cussing, screaming, knocking on lockers," hide in lockers, and run out of the building. Dawson spoke with respondent regarding M.R.'s behavior. Initially, respondent was not cooperative. However, she was "receptive" after M.R. was moved to half days. After that decision was made, respondent "asked for a parent requested meeting," which she attended. Dawson recalled visiting respondent's house with the school social worker to get her to sign a form so that M.R. could be given medication at school. They informed respondent that if it was hard for her to get M.R.'s medication, they could "pick up meds for her so that they can just be at school." Respondent ultimately signed the form, although Dawson did not remember the date it was signed.

¶ 16　　　Bria Scott testified she was a social worker at M.R.'s school and provided support for the special education program. She was aware that M.R. was suspended from school in August 2023, due to her behavior. Scott stated the school would contact her to engage with M.R. and "give her some de-escalation tactics." She stated she attempted to meet with respondent about M.R.'s behavior in "probably the first week of September [2023]." At that time, respondent would not

answer the door and stated she was unavailable to speak with Scott.

¶ 17 Scott testified she was aware that M.R. had been prescribed medication. On one occasion when M.R. had not received the afternoon dose of her medication, Scott witnessed M.R. try to run in front of a school bus. M.R. had also "tried to get onto the ledge" of a stairwell in the four-story school building "to try to jump off." On another occasion, M.R. was found hiding in a locker at school.

¶ 18 Finally, as part of its case, the State presented two videos that it asked the trial court to review. The first video was of a recorded child advocacy center (CAC) interview with M.R., during which M.R. reported that respondent would "stomp" on her back and hit her with a belt. She also stated that respondent smoked "weed" and drank Hennesey every night. The second video was from a police officer's body-worn camera. It showed the officer responding to a call from M.R.'s daycare facility following a report about M.R. having behavioral problems. The video, which had a date stamp of October 4, 2023, showed the officer speaking with M.R.'s daycare provider, who reported that M.R. had run away from the facility, flagged down a stranger's passing vehicle, and got inside the vehicle. The daycare provider further stated respondent would come to the facility "higher than a kite." The same video showed M.R. speaking with the police officer and making statements that were similar to the statements she made during her CAC interview. (Although the State asserts the latter video "has not been made available in the appellate record," we note the appellate record contains five separate video files, two of which meet the descriptions of the two videos admitted into evidence at the adjudicatory hearing.)

¶ 19 At the adjudicatory hearing, respondent testified on her own behalf. She denied ever hitting M.R. with a belt and asserted she disciplined M.R. by putting her in time out, taking away her toys, or having her "sit in her room and think about the choices that she made."

Respondent testified that M.R. did not behave at home in the way described by school personnel at the hearing. She acknowledged that during the relevant time frame, from August to October 2023, M.R. was taking medication. M.R. was prescribed Adderall, "Demetaphine," and another medication "that start[ed] with an R." According to respondent, M.R. was supposed to take three pills each day, "one for the morning, one for the afternoon, and then *** one at night."

¶ 20 Respondent testified that from the months of August to October 2023, M.R. was supposed to be taking one pill during school hours for her attention-deficit/hyperactivity disorder. She acknowledged there was a point when the school did not have medication for M.R. and explained as follows:

> "[T]here was a time when the medicine would be on backstop, which the times that [M.R.] did not take the medicine is if the pharmacy was out of it because that type of drug is hard to get, so there was times where she would run out and be out of it until the pharmacy gets another stock of them."

Respondent testified her pharmacy was out of the medication a lot and that M.R.'s doctor was aware of the issue. She also asserted that M.R.'s school tried to contact a couple of pharmacies to get the medication, but it was not available.

¶ 21 Regarding the testimony that she missed an IEP meeting, respondent asserted she had an appointment the day of the meeting and had to reschedule the meeting. She stated she attended a meeting at the school a week later and discussed "a plan to put together for [M.R.] to go back full day[s]." Respondent testified she was not always home when people would come to her house and that sometimes her friend was there. She did not recall communicating with anyone through her door or telling someone to leave. With respect to testimony that she went to M.R.'s school and smelled like cannabis, respondent stated she remembered going to the school to get

M.R. She asserted she got a ride from someone who was smoking cannabis and that she did not use cannabis herself.

¶ 22    Respondent further testified that school personnel did not notify her about any "outrageous" behavior by M.R., such as M.R. trying to run in front of a bus or climb up on a ledge at school. She asserted the school "just suspend[ed] [M.R.] and had [respondent] pick her up or they [would] just bring [M.R.] to [respondent's] house." She maintained they never told her "all those things led up to why [M.R.] got suspended or what happened." Respondent stated she was told "different reasons of why" M.R. got suspended from school but she could not remember what those reasons were.

¶ 23    Additionally, respondent admitted that there was also a time she did not want to give the school M.R.'s medication because she was in the process of moving. She asserted she "didn't want to give them the medicine and have to come back up and switch it to [M.R.'s] new school." Ultimately, however, respondent did not end up moving, and "that's when [she] went ahead and signed the release form for them to just give [M.R.] the afternoon pill." On cross-examination, respondent testified that although she did not remember when she signed the release form, the form was not signed in August 2023.

¶ 24    Following the parties' presentation of evidence, the adjudicatory hearing was continued to March 27, 2024. On that date, the trial court conducted a hearing and noted it had reviewed the videos that were submitted in the case. The parties also gave their closing arguments. The court found the State had not proven its allegations that respondent physically abused M.R. or that she kept marijuana on a counter where M.R. had access to it. However, it found the State had proved its allegations that respondent failed to make M.R.'s medication available to M.R. at school. The court stated the evidence showed M.R. "clearly ha[d] behavioral issues," as shown

through the witness testimony and the video evidence, and it found respondent was not credible when she testified that M.R. did not exhibit behavioral issues at home that were similar to the ones described by M.R.'s school's personnel. The court further found as follows:

"And I think it was proven by a preponderance of the evidence that the medication was not readily available for the child at the school, and as a result that aggravated some of the behavioral issues, and the mom was aware of it and her—and it needed to be addressed, and it wasn't clearly addressed, and the mom's explanation *** doesn't entirely make sense to the Court."

¶ 25 The trial court further noted that the State's petition contained allegations that M.R. stated respondent was "always drunk and high" and that M.R. did not feel safe at home. It stated there was "some support" for those additional allegations in the evidence presented, including a statement from M.R.'s "daycare operator" that respondent sometimes appeared " 'high as a kite' " when she picked M.R. up from daycare and evidence that school personnel noticed "the odor of cannabis" on respondent. The court concluded that the allegations in the State's petition that had been proven rose "to the level of an environment that is injurious to the welfare of [M.R.]." It entered its written order the same day, finding M.R. was neglected.

¶ 26 Also on March 27, 2024, the trial court conducted a dispositional hearing in the matter and noted that it had had received and reviewed a dispositional hearing report. The record shows the Center for Youth and Family Solutions (CYFS) filed a dispositional report on January 2, 2024, and then filed an updated version of that report on February 15, 2024. The updated report showed that respondent was 30 years old. In addition to M.R., respondent had two sons who had previously been in DCFS's care before being returned to their biological father. M.R.'s biological father was deceased. The report noted the August and October 2023 allegations that led to M.R.

being removed from respondent's care. It also noted that M.R. had previously been in DCFS's care due to domestic violence between respondent and her paramour. The report stated that during that investigation, respondent "was not cooperative and was driving without her children in proper seat restraints and repeatedly exposed them to marijuana smoke." The prior DCFS case involving M.R. was opened on April 7, 2020, and closed on August 14, 2023.

¶ 27 The report stated that in connection with the present case, respondent failed to stay in communication with her caseworkers. In October 2023, a caseworker spoke with respondent and attempted to schedule an initial meeting. However, respondent stated "she had no availability and failed to reach back out." In January 2024, a new caseworker was assigned to the matter and attempted to contact respondent by phone. The caseworker left a voicemail for respondent but, as of the date of the updated report, respondent "ha[d] yet to reach out." CYFS recommended services for respondent that included (1) individual psychotherapy; (2) a substance abuse assessment based upon respondent having "abused alcohol and drugs for many years"; (3) multifaceted trauma-informed caregiving education, counseling, and coaching; (4) family counseling; and (5) visitation. The report stated that visitations between respondent and M.R. had not yet occurred "due to [respondent] stating she has no availability 'due to her work schedule.' " The report also stated that M.R. had "expressed her reservations about having visits with [respondent]."

¶ 28 The updated report further showed that M.R. had been placed with her maternal aunt, who was also M.R.'s prior foster care placement. M.R. was reportedly adjusted well to her placement, appeared happy, and had a great bond with her caregiver. The report stated M.R. had been prescribed various medications, which she took throughout the day. Additionally, the report stated M.R. was in the fourth grade. Personnel at M.R.'s school reported that her "overall behavior and performance ha[d] improved since [she was] placed back in foster care."

¶ 29    At the dispositional hearing, a CYFS caseworker, Sarah Green, informed the trial court that there were "updates or corrections" to the dispositional report. She stated that two weeks prior to the dispositional hearing, M.R. was removed from her maternal aunt's home and placed in a traditional foster home after M.R. reported having unsupervised visits with respondent. Green stated that "due to her behavior," M.R. was currently in her third traditional foster home since being removed from her aunt's care. She noted that M.R. also "did start medication on Tuesday of last week." M.R. reportedly "did great at school Tuesday, Wednesday, Thursday" but had "a rough time at school" on Friday.

¶ 30    Green further reported that, the week prior to the dispositional hearing, respondent began having supervised visits with M.R. She asserted that there appeared "to be a bond between [respondent] and [M.R.]" and that M.R. was "excited to visit with [respondent]." Green also stated that services were offered to respondent; however, respondent stated "she wanted to wait for the Court to order services before she started anything back up." The parties presented no further evidence at the hearing.

¶ 31    The trial court found that it was in M.R.'s best interests that she be made a ward of the court. It also found respondent unfit, "based upon the contents of the petition that were proven," and placed M.R. in the custody and guardianship of DCFS. In its written dispositional order entered the same day, the court stated its finding that respondent was unfit was based on the "contents of the petition; medical neglect; suspected substance use; [and respondent's] lack of cooperation with [M.R.'s] school [and with] DCFS."

¶ 32    This appeal followed.

¶ 33                                    II. ANALYSIS

¶ 34    On appeal, respondent challenges the trial court's dispositional order. Initially, she

contends the court erred in finding her dispositionally unfit to care for M.R. Respondent asserts the court's unfitness finding was based upon the neglect allegations that it found were proven, but the evidence at the adjudicatory hearing failed to establish that M.R. was neglected either due to respondent's failure to make M.R.'s needed medications available to her at school or because respondent had substance abuse issues. Respondent also argues the court erred in finding it was in M.R.'s best interests that she be removed from respondent's care.

¶ 35　　　　Under the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2022)), the trial court employs a two-step process to determine whether a minor should be removed from his or her parents' care and made a ward of the court. *In re Z.L.*, 2021 IL 126931, ¶ 58, 190 N.E.3d 193. The first step is the adjudicatory hearing, during which " 'the court shall first consider only the question whether the minor is abused, neglected or dependent.' " *Id.* ¶ 59 (quoting 705 ILCS 405/2-18(1) (West 2018)). "Generally, neglect is defined as the failure to exercise the care that circumstances justly demand." (Internal quotation marks omitted.) *In re Arthur H.*, 212 Ill. 2d 441, 463, 819 N.E.2d 734, 746 (2004).

¶ 36　　　　Further, a neglected minor includes any child under the age of 18 "whose environment is injurious to his or her welfare." 705 ILCS 405/2-3(1)(b) (West 2022). "In general, *** the term injurious environment has been interpreted to include the breach of a parent's duty to ensure a safe and nurturing shelter for his or her children." (Internal quotation marks omitted.) *Arthur H.*, 212 Ill. 2d at 463. Courts also recognize that the term is "an amorphous concept that cannot be defined with particularity." *Id.* Ultimately, "cases involving allegations of neglect and adjudication of wardship are *sui generis*, and must be decided on the basis of their unique circumstances." *Id.*

¶ 37　　　　At the adjudicatory hearing, "[t]he State has the burden to prove allegations of

abuse or neglect by a preponderance of the evidence." *Z.L.*, 2021 IL 126931, ¶ 61. "Specifically, the State must establish the allegations are more probably true than not." *Id.* The trial court's finding of neglect will not be disturbed unless it is against the manifest weight of the evidence. *Id.* "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *Id.*

¶ 38    "If the trial court determines that a minor is abused or neglected at the adjudicatory hearing, the court then moves to step two, which is the dispositional hearing." *Id.* ¶ 60. At the dispositional hearing, the court determines "whether it is in the best interests of the minor and the public that [the minor] be made a ward of the court," as well as the proper disposition that best serves "the health, safety, and interests of the minor and the public." 705 ILCS 405/2-22(1) (West 2022). Under the Act, the court may appoint DCFS as the minor's guardian after determining that (1) the minor's parents are unfit, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor and (2) the health, safety, and best interests of the minor will be jeopardized if the minor remains in the custody of his or her parents. 705 ILCS 405/2-27(1)(d) (West 2022); see *In re J.W.*, 386 Ill. App. 3d 847, 856, 898 N.E.2d 803, 811 (2008). On review, we will reverse the court's dispositional decision "only if the findings of fact are against the manifest weight of the evidence or the court committed an abuse of discretion by selecting an inappropriate dispositional order." *J.W.*, 386 Ill. App. 3d at 856.

¶ 39                    A. Finding of Neglect

¶ 40    As stated, respondent first argues the trial court erred by relying on the neglect allegations that it determined were proven by the State to find her dispositionally unfit. She contends the evidence at the adjudicatory hearing was insufficient to establish that M.R. was neglected based upon either her failure to make M.R.'s medication available at school or her

alleged substance abuse. We disagree and find sufficient evidence supported the court's neglect finding.

¶ 41    As the trial court stated, evidence at the adjudicatory hearing clearly showed that M.R. had behavioral issues. School personnel characterized M.R. as being a danger to herself and others and described instances where M.R. used profanity, assaulted staff members, hit other students, tried to climb onto a ledge at the school, hid in a locker, and ran in front of a school bus. Video submitted by the State showed that around the same time frame, M.R.'s daycare provider reported to the police that M.R. ran away from her daycare facility and flagged down a stranger's car.

¶ 42    The evidence further showed that M.R. was prescribed medication that helped regulate her behavior, including medication for her to take during school hours. The evidence established respondent was aware of M.R.'s behavioral issues and the school's requests that it be allowed to administer medication to M.R., but respondent failed to make the medication available.

¶ 43    Respondent acknowledged during her own testimony that M.R. was prescribed medication to take at school. Although she suggested the medication was sometimes unavailable for M.R. because it was out of stock at the pharmacy, she also admitted that there was a time she did not want the school to administer medication because she planned to move. Netters, a DCFS investigator, testified she contacted respondent about the August 2023 allegations regarding M.R.'s medication and respondent reported that she would not send M.R.'s medication to school because she planned to move "and did not want to fight the school to get the medication back." Wilson-Brown, a family/school liaison, testified she spoke with respondent about M.R.'s medication and respondent asserted she wanted to administer M.R.'s medication herself and that she would not sign a form to allow medication to be administered to M.R. at school. Testimony at

the adjudicatory hearing further showed respondent was generally uncooperative with attempts to discuss M.R.'s behavioral problems, the requests to make medication available to M.R. while she was at school, and the DCFS investigation into the matter.

¶ 44 Respondent points out on appeal that the evidence showed she ultimately did sign a form authorizing the school to administer M.R.'s medication. However, the record does not show when respondent signed the form and, in fact, indicates such action was not taken until well after DCFS became involved in the matter and after M.R. had already experienced negative consequences due to her disruptive behavior. As stated above, respondent admitted that there was a time she did not want the school to administer medication to M.R. She also acknowledged that she did not sign the form at issue in August 2023, the same month DCFS began its investigation. Evidence at the hearing also suggested that respondent did not cooperate with school personnel until after a decision was made on September 13, 2023, to move M.R. to half days because of her "dis-regulated" behavior. Testimony further showed that it was not until October 2023, the same month M.R. was removed from respondent's care, that M.R. became less disruptive at school.

¶ 45 Notably, the trial court also found the evidence at the adjudicatory hearing contained "some support" for the State's allegations that M.R. reported respondent was "drunk and/or high all the time, and that [M.R.] did not feel safe in the home." The State's video evidence contained statements from M.R. that she observed respondent drunk and high. Tucker-White, the assistant principal at M.R.'s school, testified she noticed a "very significant" odor of cannabis on respondent when she visited the school. The court further noted a statement from M.R.'s "daycare operator" that respondent sometimes appeared " 'high as a kite' " at the daycare facility. Contrary to respondent's assertion that the record contains no support for such a statement, we note the video from the police officer's body-worn camera showed M.R.'s daycare provider speaking with

the police and stating respondent would come to the daycare facility "higher than a kite."

¶ 46    On appeal respondent also takes issue with the trial court's finding that her testimony was not credible. However, we can find no error in that determination where respondent provided inconsistent testimony as to why M.R. did not have her medication at school and her testimony was contradicted in several respects by the other evidence presented at the hearing. Under the circumstances, we find the State presented sufficient evidence to support its allegations of neglect and the court's neglect finding was not against the manifest weight of the evidence.

¶ 47                    B. Dispositional Findings

¶ 48    Following the March 2024 dispositional hearing, the trial court found that respondent was unfit to care for, protect, train, or discipline M.R. and that it was in M.R.'s best interests to be removed from respondent's care and placed in the custody and guardianship of DCFS. In finding respondent dispositionally unfit, the court relied upon not only the proven neglect allegations, but also respondent's "lack of cooperation." Again, the court's findings are supported by the record and not against the manifest weight of the evidence.

¶ 49    As set forth above, the evidence established M.R. was neglected based upon respondent's failure to cooperate with M.R.'s school and make M.R.'s necessary medication available to M.R. during school hours, as well as respondent's suspected substance abuse. Evidence at the dispositional hearing showed respondent had a history of substance abuse and that after M.R. was removed from respondent's care in October 2023, respondent failed to stay in communication with her caseworkers. She also reported that she had "no availability" for attending visitations with M.R. and did not begin supervised visits until a week before the March 27, 2024, dispositional hearing. CYFS recommended various services for respondent; however, when services were offered to respondent, she declined to engage in them until they were ordered by the

trial court.

¶ 50　　Additionally, the dispositional report showed M.R. was taking her prescribed medications and that her "overall behavior and performance ha[d] improved since [she was] placed back in foster care." Although the record indicates instability with respect to M.R.'s foster care placements in the two weeks leading up to the dispositional hearing, such instability was precipitated by respondent's actions in improperly having unsupervised contact with M.R.

¶ 51　　Given the evidence presented, the trial court's dispositional findings—that respondent was unfit and that M.R.'s removal from respondent's care was in M.R.'s best interests—were not against the manifest weight of the evidence. We find the court committed no error in making M.R. a ward of the court and placing her in the custody and guardianship of DCFS.

¶ 52　　　　　　　　　　　III. CONCLUSION

¶ 53　　For the reasons stated, we affirm the trial court's judgment.

¶ 54　　Affirmed.