NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2026 IL App (4th) 4250963-U

NOS. 4-25-0963, 4-25-0964 cons.

IN THE APPELLATE COURT

FILED
March 12, 2026
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| *In re* K.R., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Stephenson County |
|       Petitioner-Appellee, | ) | Nos. 25JA13 |
|       v.     (No. 4-25-0963) | ) |    25JA14 |
| Charlena P., | ) | |
|       Respondent-Appellant). | ) | |
| | ) | |
| | ) | |
| *In re* W.R., a Minor | ) | |
| | ) | |
| (The People of the State of Illinois, | ) | |
|       Petitioner-Appellee, | ) | |
|       v.     (No. 4-25-0964) | ) | Honorable |
| Charlena P., | ) | Peter McClanathan, |
|       Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE LANNERD delivered the judgment of the court.
Justices Cavanagh and Harris concurred in the judgment.

**ORDER**

¶ 1 *Held*: The trial court's finding respondent's minor children were neglected was not against the manifest weight of the evidence.

¶ 2 In February 2025, the State filed petitions pursuant to sections 2-3(1)(a) and (b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(a), (b) (West 2024)), alleging K.R. (born February 2016) and W.R. (born March 2012) were neglected minors. Following an adjudicatory hearing, the trial court found the State had proven its petitions by a preponderance of the evidence. Respondent, Charlena P., timely appealed. (The minors' father,

William R., is not a party to this appeal.) On appeal, respondent alleges the court erred in finding the State had proven its petitions "because the evidence presented was insufficient to show by the preponderance standard that the minor[s] [were] neglected." We affirm.

¶ 3                                    I. BACKGROUND

¶ 4          At the outset, we note respondent's sole argument on appeal is that the trial court erred in finding the State had proven by a preponderance of the evidence K.R. and W.R. were neglected minors. Consequently, we include only those facts necessary to address her contention on appeal.

¶ 5          On February 14, 2025, the State filed petitions alleging K.R. and W.R. were neglected minors pursuant to the Juvenile Court Act, and it was in their best interest that they be made wards of the court and placed in shelter care. The petitions claimed the minors were neglected pursuant to sections 2-3(1)(a) and (b) of the Juvenile Court Act (*id.*) in that they were "living in a home without running water, in an unsafe state of filth and inadequate heating in the winter."

¶ 6          The trial court conducted a shelter care hearing that same day. At the outset, the court advised respondent and William R. of their rights under the Juvenile Court Act and appointed counsel to represent them. After hearing testimony from an investigator for the Illinois Department of Children and Family Services (DCFS), respondent, and William R., and arguments from the parties, the court found there was probable cause for the State's petitions. However, the court determined William R.'s compliance with "critical services" would mitigate the necessity for removal of the minors. See 705 ILCS 405/2-10(2) (West 2024). (We note the allegations in the State's petitions related solely to respondent's residence and evidence presented at the hearing demonstrated respondent and William R. lived separately.) The court ordered K.R. and W.R. be

placed in William R.'s custody and entered a written order requiring William R. to "cooperate with any recommended services."

¶ 7                                    A. Adjudicatory Hearing

¶ 8             On April 22, 2025, the trial court held an adjudicatory hearing.

¶ 9                                    1. *Testimony of Nikki Sands*

¶ 10                                   a. Direct Examination

¶ 11            Nikki Sands, a child protection specialist with DCFS, investigated allegations of neglect involving K.R. and W.R. As part of her investigation, she met with K.R. and W.R. at their respective schools in November 2024. When Sands spoke to W.R., he told her he was "staying between two residences" and the residence on Benton Street (Benton Street residence) did not have any running water. Although she was unable to speak with K.R. because he was nonverbal, she observed "multiple scratches or scratch-like marks on *** [his] back and his arms and some healed abrasions or scabs on his knee." According to the school staff, K.R. arrived at school every day in a soiled diaper and soiled clothing. The school staff cleaned K.R. up with wipes and changed him into clean clothing when he arrived at school. According to Sands, the school staff noticed the marks on K.R.'s body while changing him and reported their concerns to DCFS. After observing the marks on K.R., Sands requested respondent take K.R. to the doctor about the marks. Respondent became frustrated and said, "she wasn't just going to keep running up to the doctor's office for these alleged marks or whatever, complaints that people are making on her child."

¶ 12            In January 2025, Sands met with respondent at the DCFS office to discuss a report of a new mark on K.R.'s shoulder. Respondent had K.R. with her at this meeting, and K.R. had poor hygiene and a "foul odor." Sands advised respondent she needed to take K.R. to the doctor to have the new mark examined. Respondent later provided Sands with paperwork from the

doctor's office. However, the paperwork was related to an upper respiratory infection. When Sands called the doctor's office to follow up, the doctor indicated they were not informed about any marks on K.R.

¶ 13 Sands visited the Benton Street residence in February 2025. The residence was "filthy," extremely cold, and had no running water. According to Sands, it felt like the residence had no heat. K.R. and W.R. were in an upstairs bedroom. There was a space heater in that bedroom, but it was the only space heater in the residence. K.R.'s clothing and coat were "extremely soiled," and he "had a little bit of a foul odor to him." While at the residence, Sands took photographs of the exterior, living room, bathroom, and kitchen. These photographs were admitted, without objection, as State's group exhibit No. 1. The following is a description of the photographs. In the exterior photographs, there were multiple windows covered with plywood and empty cans in the yard. The carpet in the living room was heavily stained, and there was clutter and debris throughout the room. In the bathroom, the floor was dirty and the sink and bathtub were heavily stained. There was a bucket next to the toilet, which Sands testified contained brown residue. This led Sands to believe it was used to dump waste, since the toilet was not functional without running water. In the kitchen, there were dirty dishes with rotting food on multiple surfaces.

¶ 14 According to Sands, she attempted to get access to the Benton Street residence multiple times to investigate claims of environmental neglect. However, she was unable to get access until February 13, 2025, when DCFS took protective custody of the children.

¶ 15 Sands believed respondent and the children were living at the Benton Street residence for multiple reasons: (1) the school bus picked up and dropped off the children at that residence, (2) there were reports from neighbors about "activity seen in and out of the home," and (3) there were clothes, shoes, and toys in the residence. (For clarity, we note respondent testified

at the shelter care hearing that she and the children did not live at the Benton Street residence and instead lived at a residence on James Street.)

¶ 16                  b. Cross-Examination by Respondent's Counsel

¶ 17        On cross-examination by respondent's counsel, Sands agreed the living conditions at the Benton Street residence would not constitute environmental neglect if the children did not live there. Sands agreed that although she made multiple visits to the Benton Street residence, respondent was only present at that residence twice. The other times, nobody answered the door or respondent's paramour, Cornelius A., answered the door. However, Sands testified K.R.'s bus driver informed her respondent or Cornelius A. were always present at the Benton Street residence when the bus picked K.R. up and dropped him off. Additionally, the bus driver observed K.R. exit and enter the Benton Street residence.

¶ 18        Sands arrived at the Benton Street residence sometime between 8:30 a.m. and 10 a.m. on February 13, 2025. There were also police officers and city officials present. Cornelius A. initially told Sands respondent was not there. However, Sands eventually learned respondent was upstairs. Respondent came downstairs, and law enforcement found the children in an upstairs room. According to Sands, there was a bed in the room where the children were located.

¶ 19        In November 2024, Sands told respondent she would need to visit the James Street residence as that is where respondent reported the family was living. Respondent and Sands agreed on a date for Sands to view the residence, but Sands did not make it that day. After this, Sands was never allowed access to the James Street residence. When Sands contacted the landlord to get access, she also asked whether the children lived there, and the landlord informed her he would not "say a thing."

¶ 20                  c. Cross-Examination by the Guardian *ad Litem*

¶ 21        On cross-examination by the guardian *ad litem* (GAL), Sands testified it was a five-to seven-minute drive from the James Street residence to the Benton Street residence. She estimated it would take the children approximately 10 minutes to walk from one residence to the other.

¶ 22                                d. Redirect Examination

¶ 23        On redirect examination, Sands explained K.R. required more supervision than an average child due to his special needs. He was nonverbal, enrolled in special education classes, and wore a diaper. Sands confirmed that when she spoke to W.R. in November 2024, W.R. told Sands he lived at the Benton Street residence. He never said he lived at the James Street residence.

¶ 24                                2. *Testimony of Respondent*

¶ 25                                a. Direct Examination

¶ 26        According to respondent, she and the children lived at the James Street residence and had lived there for approximately three and a half years. She was in the process of cleaning up the Benton Street residence to make it habitable. Respondent acknowledged the bucket in the bathroom of the Benton Street residence was for waste, since the toilet did not work, but she insisted she was the only person who used it.

¶ 27        Respondent denied K.R. ever went to school in soiled clothing. She testified she gave him a bath every night and "washe[d] him up again in the morning" before school. When asked about the marks on K.R., respondent testified she took K.R. to the doctor for the marks on his back and the doctor diagnosed him with hay fever.

¶ 28                                b. Cross-Examination by the State

¶ 29        On cross-examination, respondent insisted K.R. never went to school in soiled clothing and the school staff made "a false accusation" against her. Respondent also claimed Sands

coerced W.R. to say he lived at the Benton Street residence. When asked if she was "surprised that [K.R.'s doctor] said that he never examined [K.R.] for marks," respondent stated the doctor would not say that and it "was a false testimony."

¶ 30　　　　　　When asked about the scrapes and scratches on K.R., respondent stated, "Everybody got scrapes and scratches when they was kids." Respondent also noted K.R. was very playful and she "let him be a kid."

¶ 31　　　　　　Respondent denied that she and the children lived at the Benton Street residence but admitted she and the children were inside the Benton Street residence on February 13, 2025. She insisted she drove the children to the Benton Street residence every morning before the school bus arrived. Respondent acknowledged she never allowed Sands inside the James Street residence but stated Sands failed to show up on the day they agreed upon. According to respondent, it was the landlord's decision not to allow DCFS into the James Street residence.

¶ 32　　　　　　　　　　　　　　c. Cross-Examination by the GAL

¶ 33　　　　　　On cross-examination by the GAL, respondent stated she lived with her mother and sister before she moved to the James Street residence. Respondent claimed she lived at the James Street residence in 2023, but when asked about an eviction case from August 2023 involving a different address, she testified, "Well, we was back and forth." Respondent denied that she lived with Cornelius A. but admitted he cosigned a lease with her.

¶ 34　　　　　　According to respondent, the Benton Street residence was only used for storage. However, respondent acknowledged the Benton Street address was listed on her driver's license and as the children's address at their schools. Respondent claimed she never changed the address to the James Street residence because she planned to fix up the Benton Street residence.

¶ 35　　　　　　　　　　　　　　　3. *Trial Court's Ruling*

¶ 36        Following respondent's testimony, the case was continued to another date for further testimony. However, no further testimony was presented. The trial court heard arguments from the parties on June 17, 2025. Following these arguments, the court found the State had proven the allegations in the petition for adjudication of wardship by a preponderance of the evidence. The court noted the central issue was whether the children resided at the Benton Street residence, which "was not suitable for *** the children to be living there." It found respondent's testimony that she and the children lived at the James Street residence lacked credibility. The court highlighted the following evidence in support of its conclusion the children were living at the Benton Street residence: W.R. told the DCFS investigator he lived at the Benton Street residence; the children's bus driver stated the children would go in and out of the house; neighbors saw people "in and out of the home;" and respondent utilized the Benton Street residence as her official address for her driver's license and the children's schools. The court also found the conditions at the Benton Street residence constituted environmental neglect. Specifically, it noted,

> "So *** all indications certainly by preponderance of the evidence are that this is where the minors were residing, and it's certainly a home that is without running water. It is in an unsafe state of filth and had inadequate heating. One space heater was not sufficient for the needs of the house. There were *** also evidence presented in regards to the hygiene issues in regards to some of the minors."

The court entered a written order consistent with its oral ruling and set the case for a dispositional hearing.

¶ 37                              B. Dispositional Hearing

¶ 38        The trial court held a dispositional hearing on August 12, 2025. Respondent did not appear but was represented by counsel. Following arguments from the parties, the court found

William R. was "fit, willing and able to care for, protect, train and discipline the minors." Based on this, the court granted custody and guardianship of K.R. and W.R. to William R.

¶ 39  This appeal followed.

¶ 40         II. ANALYSIS

¶ 41  Initially, we must address the delay in the issuance of this disposition. As a matter involving the custody of minors, this case is subject to expedited disposition under Illinois Supreme Court Rule 311(a)(5) (eff. July 1, 2018), which requires the appellate court to issue its decision within 150 days after the filing of a notice of appeal, except for good cause shown. Here, the notice of appeal was filed on September 9, 2025, making our decision due by February 6, 2026. On December 23, 2025, we granted appellee's motion for an extension of time to file a brief, and the brief was not filed until January 13, 2026. Although every effort was made to comply with the deadline under Rule 311(a)(5), we find good cause exists for filing this decision beyond the deadline.

¶ 42  On appeal, respondent alleges the trial court erred in finding the State had proven its petitions for adjudication of wardship "because the evidence presented was insufficient to show by the preponderance standard that [K.R. and W.R.] [were] neglected."

¶ 43  "A proceeding for adjudication of wardship 'represents a significant intrusion into the sanctity of the family which should not be undertaken lightly.' " *In re Arthur H.*, 212 Ill. 2d 441, 463 (2004) (quoting *In re Harpman*, 134 Ill. App. 3d 393, 396-97 (1985)). The Juvenile Court Act sets forth the procedure the trial court must follow in determining "whether a minor should be removed from his or her parents' custody and made a ward of the court." *In re A.P.*, 2012 IL 113875, ¶ 18.

¶ 44    After the State files a petition for adjudication of wardship, the trial court must hold an adjudicatory hearing, where the State presents evidence in support of its petition. *In re Jay. H.*, 395 Ill. App. 3d 1063, 1068 (2009). At an adjudicatory hearing, " 'the court shall first consider only the question whether the minor is abused, neglected or dependent.' " *In re Z.L.*, 2021 IL 126931, ¶ 59 (quoting 705 ILCS 405/2-18(1) (West 2018)). The burden is on the State to prove the allegations of abuse or neglect by a preponderance of the evidence. *In re S.R.*, 349 Ill. App. 3d 1017, 1020 (2004). "Specifically, the State must establish the allegations are more probably true than not." *Z.L.*, 2021 IL 126931, ¶ 61. "On review, a trial court's finding of [abuse or] neglect will not be reversed unless it is against the manifest weight of the evidence." *A.P.*, 2012 IL 113875, ¶ 17. "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *Id.*

¶ 45    In this case, the evidence demonstrated the Benton Street residence was an unsuitable environment for children to live in. The photographs admitted at the adjudicatory hearing showed the residence was in a state of squalor. It had no running water, inadequate heat, extremely dirty rooms filled with clutter, and numerous dishes with rotting food. Sands testified she believed respondent and the children lived at the Benton Street residence because neighbors reported seeing people coming and going from the residence, the children's school bus picked them up and dropped them off at that residence, and W.R. stated he lived at that residence. Although respondent claimed she and the children resided elsewhere, the trial court did not find her testimony credible. See *In re D.F.*, 201 Ill. 2d 476, 498-99 (2002) (When utilizing a manifest weight of the evidence standard, the appellate court "must not substitute its judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn."). Moreover, when DCFS took protective custody of the children,

respondent and the children were at the Benton Street residence. In addition to the evidence presented regarding the unsuitable living conditions, Sands also testified about concerns from staff at K.R.'s school about his hygiene. According to the school staff, K.R. came to school in soiled clothing daily, which required the staff to clean him up. Sands also observed K.R. in soiled clothing and stated he had a "foul odor" on multiple occasions. Based on all this evidence, it is clear the trial court's determination K.R. and W.R. were neglected minors pursuant to sections 2-3(1)(a) and (b) of the Juvenile Court Act was not against the manifest weight of the evidence.

¶ 46                                III. CONCLUSION

¶ 47          For the reasons stated, we affirm the trial court's judgment.

¶ 48          Affirmed.